McGREGOR W. SCOTT
United States Attorney
ADRIAN T. KINSELLA
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Extradition of<br><br>BRANDON NATHAN TEIXEIRA<br>A/K/A "KOBE"<br>A/K/A "K"<br>A/K/A "COLBY"<br>A/K/A "JORDAN DOUGALL"<br>A/K/A "RYAN PROVENCHER" | CASE NO. 2:19-MJ-0206-CKD<br><br>MEMORANDUM OF EXTRADITION LAW AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS |

The United States, in fulfilling its treaty obligations to Canada respectfully requests that the fugitive in this case, Brandon Nathan Teixeira ("Teixeira"), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Teixeira should be detained. In short, Teixeira should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he does not pose a risk of flight, is not a danger to the community, and that special circumstances exist warranting his release.

**BACKGROUND**

Canada seeks the extradition of Teixeira so that he may stand trial on a charge of first-degree murder in violation of Section 235 of the Criminal Code of Canada. A warrant for Teixeira's arrest was issued on issued on September 6, 2018, by Judge M. Code in Surrey, within the Province of British Columbia, Canada, based on the following facts:

1

On the early morning of October 23, 2017, the Royal Canadian Mounted Police ("RCMP") in Surrey, British Columbia, received several emergency calls regarding a shooting. One of the callers ("Witness A") stated that she and her boyfriend, "N.K.", had been shot. Surrey RCMP responded to the area where the shooting was reported to have occurred and found the victim, "N.K.", had died from his wounds. An autopsy later confirmed that N.K.'s cause of death was multiple gunshot wounds. Surrey RCMP also found Witness A nearby suffering from gunshot wounds. Surrey RCMP also observed bullet holes in her car. Witness A was taken to a nearby hospital where she was treated for non-life-threatening wounds.

Witness A later reported to police that, on the night of the shooting, she had been with N.K. and a friend of N.K. whom she knew as "Kobe," and witnessed "Kobe" fire a gun at N.K. She told authorities that she then fled the scene in her car and called 911. A couple of weeks after the shooting, Witness A identified a photograph of Teixeira, whom she knew as "Kobe," from a photo line-up shown to her by police, as the person who shot N.K.

Canadian authorities also interviewed a cooperating witness ("Witness B"), who told police that he had participated with Teixeira in the planning for, and preparation of, N.K.'s murder. Witness B further told police that Teixeira told Witness B the following: (a) shortly before N.K.'s murder, Teixeira had been with N.K. when both of them had been fired upon; Teixeira believed this incident had been a result of N.K. setting him up, and Teixeira consequently wanted to kill N.K.; (b) there was a $160,000 contract out for the murder of N.K., which further motivated Teixeira to kill N.K.; and (c) Teixeira planned to use his roommate's black Jeep during the shooting, while burning a second black Jeep near the crime scene, in an attempt to deceive police as to which vehicle was used during the murder.

Witness B also reported that he was present during Teixeira's shooting of N.K. Witness B stated that, on the night of the shooting, he and Teixeira arranged to meet N.K. under the pretext of purchasing fireworks from N.K. Teixeira and N.K. met in a cul-de-sac and spoke for 20-30 minutes while Witness B hid in the Jeep Teixeira was driving. When N.K. moved to get something out of his girlfriend's car, Teixeira took a gun from his clothes and shot N.K. in the back, while also shooting N.K.'s girlfriend, Witness A. N.K's girlfriend then drove away quickly. N.K. ran toward a house, while Teixeira continued to fire shots at him.

Eventually, Teixeira returned to the Jeep where Witness B was hiding, and the two men drove away. They subsequently disposed of the gun that Teixeira had used during the shooting and burned the second black Jeep as part of their plan. The two men subsequently saw in news reports that N.K. died and his girlfriend survived.

Police determined through interviews with Avis Car Rental employees that a black Jeep Compass had been rented on October 1, 2017 and returned on October 24, 2017 (the day following N.K.'s killing), under the name of Teixeira's roommate, "R.P." Forensic analysts examined the Jeep Compass, including extracting DNA from blood found in the interior of the vehicle. Comparison of the DNA samples to those stored in Canadian databases confirmed that Teixeira's DNA matched those of the samples taken from the Jeep. Additionally, using traffic cameras, the police determined that the burnt, black Jeep near the crime scene was not the same vehicle the suspect drove away from the crime scene.

Police databases checks further showed that Teixeira went by the aliases "Colby" and "Kobe," as he was known to Witness A. Teixeira's aliases were further corroborated by information found on several phones that were seized by police during the execution of a search warrant on November 3, 2017. Examination of those phones showed that R.P.'s phone contained a contact named "Brandon," whom R.P. also referred to as "KOBE" in text messages with another person.

Canada subsequently requested that Teixeira be provisionally arrested, with a view to extradition, pursuant to its extradition treaty with the United States ("the Treaty"). On November 29, 2019, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 et seq., the Unites States prepared a complaint in this District seeking a provisional arrest with a view towards extradition. This Court issued the arrest warrant that same day. The following morning, U.S. Marshals Service and the Butte County Sheriff's Department surrounded the house Teixeira was residing in, announced over loudspeaker that they had a warrant for his arrest, and ordered him to come out with his hands up. Teixeira initially feigned surrender by coming out with his hands up, but then attempted to escape by running to his car and apparently attempting to drive away. When law enforcement disabled Teixeira's vehicle by ramming it, he abandoned the vehicle and ran, on foot, until he was apprehended by a police K9. Teixeira is currently in the custody of the U.S. Marshals Service.

//

**ARGUMENT**

**I.  LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS**

    **A.  The limited role of the Court in extradition proceedings**

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see*, *e.g.*, *United States v. Knotek*, 925 F.3d 1118, 1124 (9th Cir. 2019) ("As we have stated on many occasions, '[e]xtradition is a matter of foreign policy,' a diplomatic process over which the judiciary provides 'limited' review.") (citation omitted). The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Santos v. Thomas*, 830 F.3d 987, 993 (9th Cir. 2016) (internal citations omitted). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)) (analogizing extradition hearings to preliminary hearings in a criminal case). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see also Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006); *Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000).

//

**B.     The requirements for certification**

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See*, *e.g.*, *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008) (internal citations omitted).  The following sections briefly discuss each of those requirements.

   1.     Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184.  As such, the judicial officer conducting the extradition hearing prescribed by § 3184 does not exercise "any part of the judicial power of the United States," *In re Extradition of Kirby*, 106 F.3d 855, 866 (9th Cir. 1996), but rather is acting in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993).  Both magistrate judges and district judges may render a certification under § 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); Local Rule 302(b)(8) (authorizing magistrate judges to conduct extradition proceedings in accordance with 18 U.S.C. § 3181 *et seq.*).

   2.     Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Teixeira, who is found within its jurisdictional boundaries.  18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

   3.     Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state.  *See id.*; *see also Then v. Melendez*, 92 F.3d 851, 853 (9th Cir. 1996) (noting that "the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty.").  The government

5

will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Canada. The Court must defer to the Department of State's determination in that regard. *See Then*, 92 F.3d at 854.

### 4. Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the Treaty. Article 1 of the applicable treaty in this case provides for the return of fugitives who are sought for trial or punishment for "extraditable offenses" as that term is defined under the Treaty. "The question of whether an offense is extraditable involves determining: (1) whether it is listed as an extraditable crime in the relevant treaty; (2) whether the alleged conduct is criminalized in both countries; and, (3) whether the offenses in both countries are substantially analogous." *Knotek*, 925 F.3d at 1128-29.

Article 2 of the Treaty defines offenses as extraditable if the conduct on which the offense is based is punishable under the laws of both the United States and Canada by deprivation of liberty for a period exceeding one year or greater punishment. In assessing whether the crimes for which extradition is requested are covered by the Treaty, the Court should examine the description of criminal conduct provided by Canada in support of its charges and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See*, *e.g.*, *id*. at 1129 n.10. A requesting country need not establish that its crimes are identical to ours. *Id*. at 1131; *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical."). Rather, "the court looks at whether 'the essential character of the transaction is the same, and made criminal by both statutes.'" *Knotek*, 925 F.3d at 1131 (quoting *Wright v. Henkel*, 190 U.S. 40, 62 (1903); brackets omitted). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the Court should liberally construe the Treaty in

order to effectuate its purpose, namely the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 298-300 (1933); *see also, e.g., Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"); *In Re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1305 (D. Or. 2013). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

          5.      <u>Probable cause that the fugitive has committed the offenses</u>

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crimes charged by Canada were committed by the person before the Court. *See Vo*, 447 F.3d at 1237. The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn*, 783 F.2d at 791 (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)); *see also In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1121 (E.D. Cal. 2003).

**C.**    **An extradition hearing follows unique procedures**

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding, *see*, *e.g.*, *Kamrin v. United States*, 725 F.2d 1225, 1228 (9th Cir. 1984); *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993), and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct*., 834 F.2d 1444, 1450-51 (9th Cir. 1987).

The Federal Rules of Evidence do not apply to extradition proceedings. Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Then*, 92 F.3d at 855.  Indeed, hearsay evidence is admissible at an extradition hearing, and, moreover, a certification of extraditability is properly based entirely on the authenticated documentary evidence and information provided by the requesting government. *See*, *e.g.*, *Collins*, 259 U.S. at 317; *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986). Nothing more is required, and typically nothing more is provided. *See*, *e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 627-28 (9th Cir. 1984) (police report describing witness statements is competent evidence); *In re Extradition of Mainero*, 990 F. Supp. 1208, 1212-13 & 1226-29 (S.D. Cal. 1997) (statements of co-conspirators and other witnesses sufficient in extradition to Mexico). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *see also*, *e.g.*, *Zanazanian*, 729 F.2d at 626-27.

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive"); *Mathison*, 974 F. Supp. 2d at 1304. A fugitive has no right to discovery. *See*, *e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005). Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see*, *e.g.*, *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); there is no Sixth Amendment right to a speedy trial, *see*, *e.g.*, *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see*, *e.g.*, *In re Extradition of Powell*, 4 F. Supp. 2d 945, 951 (S.D. Cal. 1998) (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *see*, *e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see*, *e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but

rather may only introduce evidence explaining the submitted evidence. See *Charlton*, 229 U.S. at 461-62; *Strunk*, 293 F. Supp. 2d at 1122. A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)). The admission of explanatory evidence is largely within the discretion of the Court. *See Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978); *Strunk*, 293 F. Supp. 2d at 1122.

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See*, *e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Hooker*, 573 F.2d at 1368 (noting that extradition court "properly may exclude evidence of alibi, or facts contradicting the government's proof, or of a defense such as insanity"). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### D. Rule of non-inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Prasoprat*, 421 F.3d at 1016 (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch); *Quinn*, 783 F.2d at 789-90 (noting that "the Secretary of State has sole discretion to determine whether a request for extradition should be denied because it is a subterfuge made for the purpose of punishing the accused for a political crime, or to refuse extradition on humanitarian grounds because of the procedures or treatment that await a surrendered fugitive") (citation omitted). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

//

## II. TEIXEIRA SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case. *See Kamrin*, 725 F.2d at 1228; *Martin*, 993 F.2d at 828. Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.    Applicable law

#### 1.    <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, "[t]here is a presumption against bail in an extradition case." *Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989); *see also Martin*, 993 F.2d at 827; *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1294 (S.D. Fla. 2017) ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process"). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62.

10

It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

### 2. Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, and (2) "special circumstances" warrant their release. *See, e.g., In re Extradition of Kirby*, 106 F.3d at 862-63; *Leitner*, 784 F.2d at 160-61; *In re Extradition of Antonowitz*, 244 F. Supp. 3d 1066, 1068 (C.D. Cal. 2017); *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996). "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See*, *e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk). Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See*, *e.g.*, *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Salerno*, 878 F.2d at 317-18 (lack of flight risk "is not a criteria for release in an extradition case"). Accordingly, a fugitive

who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *Mainero*, 950 F. Supp. at 294 (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)).  Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see*, *e.g.*, *Kin-Hong*, 83 F.3d at 525;

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see*, *e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, and/or ties to the community, *see*, *e.g.*, *In re Extradition of Noeller*, No. 17-CR-664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact that the fugitive may have been living openly, *see*, *e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see*, *e.g.*, *In re Extradition of Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see*, *e.g.*, *Antonowitz*, 244 F. Supp. 3d at 1072; *Matter of Knotek*, No. LA CV 13-9204-BRO (JCG), 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see*, *e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see*, *e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see*, *e.g.*, *Salerno*, 878 F.2d at 318; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see*, *e.g.*, *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors,

as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### B.     Analysis

The Court should detain Teixeira without bond because he is a flight risk and a danger to the community. *First*, Teixeira is wanted on a charge of first-degree murder; he shot his victim in the back and continued to shoot him as his victim was attempting to run away. Given the seriousness nature of the offense, the community both here in the United States and elsewhere would be at risk if Teixeira were released from custody. *Second*, Teixeira has a strong incentive to flee from the United States or to an underground location in the United States given potential lifetime punishment he is facing in Canada. Indeed, during the arrest in this case, Teixeira attempted to run to his car in apparent effort to flee from U.S. authorities, and continued to run when law enforcement disable his car. The serious nature of the charged offense weighs significantly against granting bail in this case. *See*, *e.g.*, *Perez-Cueva*, 2016 WL 884877, at *3 (seriousness of allegations against fugitive "militates against release on bail"). Allowance of bail in any amount would not guarantee Teixeira's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

Teixeira's risk of flight and danger to the community are sufficient for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that he is not a flight risk and poses no danger to the community here or abroad, the government is unaware of any "special circumstances" that would justify bail in this case.

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to Canada, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

//

//

//

**III.    CONCLUSION**

For the foregoing reasons, the United States requests that Teixeira be detained pending resolution of this extradition proceeding.

Respectfully submitted,

Dated:  December 2, 2019

McGREGOR W. SCOTT
United States Attorney

By: /s/ Adrian T. Kinsella
ADRIAN T. KINSELLA
Assistant United States Attorney