# Exhibit 1

 Embassy of the United States of America

Certificate to be Attached to Documentary Evidence Accompanying Requisitions
in the United States for Extradition

## AMERICAN FOREIGN SERVICE

Ottawa, Canada, February 10, 2020

I, Richard M. Mills, Chargé d'Affaires of the United States of America at Ottawa, Canada, hereby certify that the annexed papers, being authenticated supporting documents proposed to be used upon an application for the extradition from the United States of **Brandon Nathan Teixeira** who stands charged in the Province of British Columbia with one count of first degree murder, contrary to s. 235(1) of the *Criminal Code*; two counts of attempted murder, contrary to s. 239(1)(b) of the *Criminal Code*; two counts of aggravated assault, contrary to s. 268() of the *Criminal Code*; one count of assault with a weapon, contrary to s. 267() of the *Criminal Code*; one count of uttering threats, contrary to s. 264.1() of the *Criminal Code* and one count of discharging a firearm with intent, contrary to s. 244(1) of the *Criminal Code* are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of Canada, as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed this 10th day of February 2020.

Richard M. Mills
Chargé d'Affaires of the
United States of America

SENSITIVE BUT UNCLASSIFIED

Foreign Service



Embassy of the United States of America

## Certificate to be Attached to Documentary Evidence Accompanying Requisitions in the United States for Extradition

## AMERICAN FOREIGN SERVICE

Ottawa, Canada, January 21, 2020

I, Richard M. Mills, Chargé d'Affaires of the United States of America at Ottawa, Canada, hereby certify that the annexed papers, being authenticated supporting documents proposed to be used upon an application for the extradition from the United States of **Brandon Nathan Teixeira** who stands charged in the Province of British Columbia with one count of first degree murder, contrary to s. 235(1) of the *Criminal Code*; two counts of attempted murder, contrary to s. 239(1)(b) of the *Criminal Code*; two counts of aggravated assault, contrary to s. (2) of the *Criminal Code*; one count of assault with a weapon, contrary to s. (a) of the *Criminal Code*; one count of uttering threats, contrary to s. 2 (1) of the *Criminal Code* and one count of discharging a firearm with in , contrary to s. 244(1) of the *Criminal Code*.

witness whereof I hereunto sign my name and cause my seal of office to aff d this 21st day of January 2020.

Richard M. Mills
Chargé d'Affaires of the
United States of America

Form 36 Service

Department of Justice    Ministère de la Justice
Canada                   Canada

Ottawa, Canada
K1A 0H8

## **CERTIFICATE OF AUTHENTICATION**

IN THE MATTER OF the request for the extradition of **Brandon Nathan Teixeira** from the United States of America to Canada

I, Cathy Chalifour, Senior Counsel, International Assistance Group, Department of Justice of Canada, do hereby certify:

THAT attached to this Certificate is authenticated documentation presented by Canada in support of the request for the extradition of **Brandon Nathan Teixeira** who stands charged in the Province of British Columbia with one count of first degree murder, contrary to s. 235(1) of the *Criminal Code*; two counts of attempted murder, contrary to s. 239(1)(b) of the *Criminal Code*; two counts of aggravated assault, contrary to s. 268(2) of the *Criminal Code*; one count of assault with a weapon, contrary to s. 267(a) of the *Criminal Code*; one count of uttering threats, contrary to s. 264.1(1) of the *Criminal Code* and one count of discharging a firearm with intent, contrary to s. 244(1) of the *Criminal Code*.

THAT the documentation attached to this certificate is composed of:

- the Affidavit of Dianne M. Wiedemann, Prosecutor, Ministry of the Attorney General of British Columbia, to which is appended:

    - as appendix "A", a true copy of the Information No. 230175-2-C sworn by Cpl Kris Mouland before Justice of the Peace A. Ferguson on December 20, 2019;

    - as appendix "B", a true copy of the warrant for the arrest issued by Justice of the Peace A. Ferguson on December 20, 2019;

    - as appendix "D", a true copy of the Information No. 218442-1 sworn by Yme Smid, court liaison officer, before Justice of the Peace J. Morrison on September 8, 2016;

    - as appendix "E", a true copy of the warrant for the arrest issued by E. Zasada, clerk of the court, on behalf of Judge D.H. Weatherly on November 22, 2018;



- 2 -

-     as appendix "F", a true copy of the Information No. 103266-1 sworn by Peace Officer Michael Gafka before Justice of the Peace D. Mills on December 5, 2019; and

-     as appendix "G", a true copy of the warrant for the arrest issued by Justice of the D. Mills on December 5, 2019;

- the Affidavit of Fact of Corporal Kris Mouland, peace officer with the Royal Canadian Mounted Police.

THAT Caroline Richardson, whose original signature appears at the end of the Affidavit and exhibits thereto of DIANNE M. WIEDEMANN, is a Barrister & Solicitor and a Commissioner of Oaths for the Province of British Columbia, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

THAT Ed Yoshiyama, whose original signature appears at the end of the Affidavit and exhibits thereto of Corporal KRIS MOULAND, is a Commissioner of Oaths for the Province of British Columbia, having been duly commissioned and duly authorized by the laws thereof to administer oaths and to take affidavits within the said Province.

The Seal of the Minister of Justice of Canada is hereby affixed this 17th day of January, 2020.

Cathy Chalifour

| | | |
|---|---|---|
| **CANADA** | ) | **HER MAJESTY THE QUEEN** |
| | ) | |
| **PROVINCE OF BRITISH COLUMBIA** | ) | **v.** |
| | ) | |
| **VANCOUVER REGISTRY** | ) | **BRANDON NATHAN TEIXEIRA** |
| | ) | |

**IN THE MATTER of a request by Canada for the Extradition of Brandon Teixeira from the United States of America who stands charged in Canada with Offences under the *Criminal Code* of Canada.**

---

## AFFIDAVIT OF LAW OF
## DIANNE M. WIEDEMANN

---

I, Dianne M. Wiedemann, Barrister and Solicitor, of the City of Vancouver, in the Province of British Columbia, Canada, **MAKE OATH AND SAY AS FOLLOWS:**

## A.   OVERVIEW OF EXTRADITION REQUEST

1.      Canada is seeking the Extradition of Brandon Nathan TEIXEIRA (d.o.b. ▮▮▮▮ 1991) so that he may face charges under the *Criminal Code* of Canada, specifically: First Degree Murder contrary to s. 235(1), Attempted Murder (x2) contrary to s. 239(1)(b), Aggravated Assault (x2) contrary to s. 268(2), Assault with a Weapon contrary to s. 267(a), Uttering Threats contrary to s. 264.1(1), and Discharging a Firearm with Intent contrary to s. 244(1).

2.      All the offences for which TEIXEIRA has been charged were committed in the Province of British Columbia, Canada, and are the offences/charges upon which Canada seeks the extradition of TEIXEIRA from the United States of America.

3.      TEIXEIRA was provisionally arrested in California on December 1st, 2019.

4.     This Affidavit of LAW refers to and is accompanied by an Affidavit of FACT of Cpl. Kris Mouland, a peace officer and a regular member of the Royal Canadian Mounted Police stationed at Surrey, British Columbia, which sets out the evidence relating to each of the offences.

5.     A photograph of TEIXEIRA and a copy of his fingerprints are attached to the Affidavit of FACT. The charging documents and arrest warrants are attached to this Affidavit of LAW, below.

## B.     **QUALIFICATIONS**

6.     I am a citizen of Canada and a resident of the City of Vancouver, in the Province of British Columbia, Canada.

7.     In 1987 I received a Bachelor of Laws (LLB) from the University of Victoria, Victoria, British Columbia, Canada. In May of 1988 I was called to the Bar of the Province of British Columbia and was admitted as a solicitor of the Supreme Court of British Columbia. From that time until the present time, I have been a member in good standing of the Law Society of British Columbia, and as such, I am entitled to practice law and have practiced law in the Province of British Columbia as a Barrister and Solicitor. I am also a Notary Public for the Province of British Columbia.

8.     From June 1989 until the present time, I have held the position of Crown Counsel employed by the BC Prosecution Service, Ministry of Justice for the Province of British Columbia, in Vancouver, British Columbia, Canada.  My practice has focused on the prosecution of major crimes and special prosecutions. Presently, I am assigned to the Special Prosecutions office located at 865 Hornby Street, Vancouver, British Columbia.

9.     The BC Prosecution Service is comprised of about five hundred and fifty-five lawyers, all of whom specialize in criminal law. The responsibilities of the BC Prosecution Service include representing the Crown in all criminal trials and appeals for the Province of British Columbia at all levels of court in Canada. Another function of the BC Prosecution Service is to exercise responsibility on behalf of the Attorney General of British Columbia, with respect to applications by the Attorney General of British Columbia, for the extradition to Canada from foreign jurisdictions of persons charged in British Columbia with offences contrary to Canada's *Criminal Code,* R.S.C. 1985, c. C-46.

10.     My primary responsibility as Crown Counsel has been as a trial prosecutor for a range of offences including crimes of violence and offences against the administration of justice. In this role, I routinely make oral and written submissions to the Court about how Canadian criminal law and procedure operates. As Crown Counsel, from time to time I have also had charge approval responsibilities. These responsibilities include reviewing evidence gathered during the course of police investigations and making an assessment of whether there is a substantial likelihood that a person will be convicted of an offence based on that evidence.

11.     Based upon my training and experience, I am an expert in the criminal law and procedure of Canada.

## C.     OVERVIEW OF THE CANADIAN CRIMINAL LAW

12.     The *Criminal Code* of Canada, Revised Statutes of Canada, 1985, chapter C-46, as amended, is a statute duly enacted by the Parliament of Canada. It contains the law relating to criminal offences for the whole of Canada. It therefore applies to British Columbia and is at the present time in force in Canada and in the Province of British Columbia. The *Criminal Code* was also in force throughout Canada at the time TEIXEIRA committed the offences for which he is charged, as set out in the Affidavit of FACT.

13.     In each of Canada's provinces, the provincial Attorney General has jurisdiction to enforce criminal law and conduct prosecutions relating to offences set out in the *Criminal Code.*

14.     To be convicted of a criminal offence in Canada, the prosecution must prove all elements of the offence beyond a reasonable doubt.

15.     Before charges are laid in the province of British Columbia, a prosecutor reviews all the evidence obtained in the police investigation. It is the policy of the Attorney General for British Columbia that, with limited exceptions, charges are only approved if the prosecutor is satisfied not only that there is a substantial likelihood of conviction on the available evidence, but also that it is in the public interest to proceed with charges against the accused.

16.     Pursuant to the *Criminal Code,* a form called an "Information" is the document by which charges are initiated and brought before the court. The purpose of the Information is to state the

3

offences an accused person is facing and to give notice of the particular offence(s) they are alleged to have committed.  Charges are formally laid when a peace officer swears under oath that he or she has reasonable and probable grounds to believe that an accused has committed the offence(s) detailed in the Information

17.     TEIXEIRA has been charged on three Informations, for offences that occurred on three different dates.

18.     The *Criminal Code* sets out a formal definition of every offence, the maximum sentences possible for those offences, and sometimes also a minimum sentence that must be imposed for some offences.

19.     Under Canadian law, criminal offences are divided into three categories:

- indictable offences;
- summary conviction offences; and
- offences that are, at the election of the prosecution, either indictable or summary conviction. (These offences are referred to "hybrid" offences.)

20.     Generally speaking, indictable offences are more serious offences carrying more severe penalties whereas summary conviction offences are generally less serious offences that carry less severe penalties.

21.     The *Criminal Code* contains provisions that codify the offences with which TEIXEIRA has been charged. The provisions, as described below, would be applicable in the event of a trial on the three Informations which charge the offences that are the subject matter of this affidavit.

22.     All of the charges for which the Extradition of TEIXEIRA is sought are Hybrid or Indictable offences. The Crown is proceeding by Indictment on all offences listed on the Informations charging TEIXEIRA.

23.     Offences prosecuted by Indictment do not have a limitation period with respect to the time before which an offence must be sworn against an accused.  The prosecution of these offences will not become barred by lapse of time.

24.     TEIXEIRA has not been tried and discharged or punished in Canada for the offences for which his extradition is sought.

**D.     DETAILS OF INFORMATION #230175-2-C PROSECUTION FOR THE OFFENCES OF FIRST DEGREE MURDER, ATTEMPT MURDER AND DISCHARGING A FIREARM WITH INTENT**

25.     On September 6th, 2018, TEIXEIRA was charged by the Attorney General of British Columbia with the first degree murder of NK on or about the 23rd day of October, 2017, at or near Surrey, in the Province of British Columbia.

26.     On December 20, 2019, a new "C" Information was sworn adding two additional counts, such that the Information charged TEIXEIRA with the following *Criminal Code* Offences:

     a.     First Degree Murder of NK, contrary to s.235(1)

     b.     Attempted Murder of Person A, contrary to s.239(1)(b)

     c.     Discharging a Firearm with Intent, contrary to s.244(1)

27.     The new Information was sworn by Cpl Kris Mouland before A. Ferguson, a Justice of the Peace in and for the Province of British Columbia. The Information was filed with the Surrey Court Registry with Court file number 230175-2-C. A true copy of the said information is attached to this Affidavit as **Exhibit A**.

28.     A warrant of arrest was issued by Justice of the Peace A. Ferguson on December 20, 2019 pursuant to that new Information and is outstanding in Canada. Attached as **Exhibit B** to this Affidavit is a true copy of a Warrant of Arrest issued by Justice of the Peace A. Ferguson on December 20, 2019 for the arrest of TEIXEIRA.

**Elements of the Offence**

29.     The circumstances and overview of the evidence concerning the offences charged in Information 230175-2-C - the fatal shooting of NK and non-fatal shooting of Person A - are set out in detail in the Affidavit of FACT of Kris Mouland. The Crown will be able to prove all of the elements of the offences of First Degree Murder, Attempted Murder, and Discharging a Firearm with Intent, based on the available evidence:

#### a. Murder of NK

i.    That TEIXEIRA committed the offence – he was identified by the victim Person A by way of a photopack, and was well known to the police agent, ■, who was with him at the time of the shooting.

ii.    That the offence was committed at the time and place set out in the Information, as described by Person A, and by the police agent ■.

iii.    That TEIXEIRA committed an unlawful act in that he shot at NK with a firearm, as described by Person A and police agent ■.

iv.    That the unlawful act caused the death of NK, as established by medical examination of NK upon arrival at Surrey Memorial Hospital. The examining physician confirmed that death was caused by gunshot wounds.

v.    That TEIXEIRA meant to cause death – he discussed his intentions with police agent ■ and witness SMB prior to the shooting, and due to the evidence of the proximity of TEIXEIRA to NK as he was firing at him.

vi.    A murder that is planned and deliberate is classified as First Degree.

vii.    That the murder of NK was planned and deliberate, as established by the evidence of police agent ■, who had discussed and planned the murder of NK with TEIXEIRA, which was committed by TEIXEIRA for retribution and profit. Cell phone extraction evidence also establish that the murder was planned and deliberate.

#### b. Attempted Murder of Person A

i.    That TEIXEIRA attempted to murder person A in that he had the intent to murder her and that he did something with the purpose of carrying out that intention. Both elements are established by the evidence of Person A and police agent ■, in that TEIXEIRA shot at her at close range and at her car with a firearm.

c. **Discharging a Firearm with Intent**

    i.    That TEIXEIRA discharged a firearm at Person A with the intention of wounding, maiming or disfiguring her as established by the evidence of Person A and the medical examiner who confirmed that he extracted a bullet from the body of Person A that had caused a wound. The evidence of Person A and ▮ establishes that TEIXEIRA was the shooter. (the police agent)- ATK 2/18/2020

30.    The *Criminal Code* contains several provisions related to the charges on this Information. All *Criminal Code* provisions relevant to this Information are set out in full, and attached to this Affidavit as **Exhibit C**.

31.    These sections of the *Criminal Code* of Canada were in full force and effect on October 23rd, 2017, the date of the commission of the offences alleged in this extradition request, and continue to be in effect.

**Punishment**

32.    Murder is punishable upon conviction by a mandatory sentence of life imprisonment. A conviction for first degree murder carries a mandatory minimum parole ineligibility of 25 years. A conviction for second degree murder carries a mandatory minimum period of parole ineligibility of 10 years. In both cases, the time of parole ineligibility is set at the time of sentence.

33.    All of the other offences listed on this Information are punishable by a term of imprisonment exceeding one year.

34.    The maximum penalty for the offence of Attempted Murder is prescribed by s. 239(1)(b) of the *Criminal Code*, and is imprisonment for life.

35.    The maximum penalty for the offence of Discharging a Firearm with Intent is prescribed by s.244(2)(a) of the *Criminal Code*, and is 14 years imprisonment.

36.    The punishment provisions of the *Criminal Code* relating to the offences charged on Information #230175-2 C are also set out in **Exhibit C**, attached to this Affidavit.

## E.     INFORMATION #218442-1 PROSECUTION FOR AGGRAVATED ASSAULT WITH A WEAPON AND UTTERING THREATS

37.     On September 8, 2016, TEIXEIRA was charged by the Attorney General of British Columbia for the stabbing of DC on the 26th day of June, 2016, at or near Surrey, in the Province of British Columbia. The Information contains the following *Criminal Code* Offences:

  a.  Aggravated Assault of DC, contrary to s.268(2)

  b.  Use of a weapon in assaulting DC, contrary to s.267(a)

  c.  Uttering a Threat to DC, contrary to s.264.1(1)

38.     The Information was sworn before J. Morrison, a Justice of the Peace in and for the Province of British Columbia on September 8, 2016. The Information was filed with the Surrey Court Registry with Court file number 218442-1. A true copy of the said Information is attached to this Affidavit as **Exhibit D**.

### Elements of the Offences

39.     The circumstances and overview of the evidence relating to the offences charged in Information 218442-1 – the stabbing and threatening of DC - are set out in detail in the Affidavit of FACT of Kris Mouland. The Crown will be able to prove all of the elements of the offence of Aggravated Assault, Assault with a Weapon and Uttering Threats, based on the available evidence:

#### a.  Aggravated Assault of DC

  i.   That TEIXEIRA committed the offence – the stabbing of DC was captured by closed-circuit television (CCTV) footage at the door area of the Tap House Bar. In addition, victim DC and witnesses AR, LB and AU all identified TEIXEIRA as the stabber from a photopack. The footage was viewed by police agent ██, a close associate of TEIXEIRA, who was able to identify him as the attacker. Witness WJ advised that the attacker had used a knife with a 4" blade.

  ii.  That the offence happened at the time and place as specified in the Information – as established by the evidence of DC and other witnesses in relation to his stabbing.

8

iii.   That TEIXEIRA applied force and intended to apply force to DC, as established by the footage of the attack and the evidence of DC and bystanders.

iv.   That DC did not consent to the application of force and that TEIXEIRA knew that DC did not consent to the application of force – as established by the evidence of DC, and the footage of the assault.

v.   That the assault by TEIXEIRA wounded, maimed, disfigured, or endangered the life of DC and that a reasonable person would inevitably have realized that such an assault would subject DC to the risk of bodily harm – as established by the evidence of DC, the footage of the assault, and the evidence of the ambulance attendants and physicians who treated DC for life-threatening stab injuries.

**b.  Use of a Weapon in Assaulting DC**

i.   That TEIXEIRA carried, used, or threatened to use a weapon or an imitation of a weapon when he applied force to DC – as evidenced by the footage of the assault, the evidence of WJ, the evidence of DC, and the medical evidence that DC sustained serious stab wounds in the head, neck, shoulders, and wrist.

**c.  Uttering Threats to DC**

i.   That TEIXEIRA uttered, conveyed a threat to cause bodily harm to DC – as established by the evidence of witness AU that TEIXEIRA said that he was going to kill DC.  Specifically, that TEIXEIRA said to AU: "Tell him he's dead.  Tell him that Tony or Colby is going to get him."

40.   A trial date had been set for the commencement of a trial on these charges for December 14, 2018.  Prior to the trial date, on November 22nd, 2018, a Section 524 Warrant for Arrest was issued by E. Zasada, a Clerk of the Court, on behalf of Judge D H Weatherly.  A section 524 Warrant for Arrest is issued when there are reasonable and probable grounds to believe that an accused has violated or is about to violate the Recognizance of Bail upon which he was released.  Section 524 of the *Criminal Code* is set out in **Exhibit C** attached to this Affidavit. The reasonable and probable grounds arose from the attempted arrest of TEIXEIRA on September 5, 2018 in relation to the murder

of NK, at which time TEIXEIRA evaded arrest and escaped police custody. Attached as **Exhibit E** to this Affidavit is a true copy of a Warrant of Arrest issued by E. Zasada, on behalf of Judge D H Weatherly, on November 22, 2018 for the arrest of TEIXEIRA.  In addition to issuing the warrant, the Court struck the December 14, 2018 trial date, and witnesses were de-notified.

41.      The *Criminal Code* contains several provisions related to the charges on this Information.  **All** *Criminal Code* provisions relevant to this Information are set out in full and attached to this Affidavit as **Exhibit C**.

42.      Sections 268(1), 267, 264.1(1), and 524 of the *Criminal Code* of Canada were in full force and effect on June 26, 2016, the date of the commission of the offences alleged in this extradition request, and continue to be in effect.

**Punishment**

43.      All of the offences listed on this Information are punishable by a term of imprisonment exceeding one year.

44.      The maximum punishment for the Offence of Aggravated Assault is prescribed by s.268(2) of the *Criminal Code*, and is 14 years imprisonment.

45.      The maximum punishment for the Offence of Assault with a Weapon is prescribed by s.267(a) of the *Criminal Code*, and is 10 years imprisonment.

46.      The maximum punishment for the Offence of Uttering Threats is prescribed by s.264.1(1) of the *Criminal Code*, and is 5 years imprisonment.

47.      The punishment provisions of the *Criminal Code* relating to the offences charged on Information   218442-1   are   also   set   out   in   **Exhibit   C**,   attached   to   this   Affidavit.


**F.      INFORMATION #103266-1 PROSECUTION FOR THE OFFENCES OF ATTEMPT MURDER AND AGGRAVATED ASSAULT**

48.      On December 5, 2019, TEIXEIRA was charged by the Attorney General of British Columbia with the stabbing of P.D. and C.W, on August 23, 2015, at or near Maple Ridge, in

the Province of British Columbia.   The Information contains the following *Criminal Code* Offences:

    a.   Attempted Murder of P.D., contrary to s. 239(1)(b)

    b.   Aggravated Assault of C.W.., contrary to s.268(2)

49.   The Information was sworn on December 5, 2019 before D. Mills, a Justice of the Peace in and for the Province of British Columbia. The Information was filed with the Port Coquitlam Court Registry with Court file number 103266-1. A true copy of the said information is attached to this Affidavit as **Exhibit F.**

50.   A warrant of arrest was issued by Justice of the Peace D. Mills on December 5, 2019 pursuant to that Information and is outstanding in Canada. Attached as **Exhibit G** to this Affidavit is a true copy of a Warrant of Arrest issued by D. Mills on December 5, 2019 for the arrest of TEIXEIRA.

**Elements of the Offence**

51.   The circumstances and evidence relating to the offences charged in Information 103266-1 – the Attempted Murder of PD by stabbing and the Aggravated Assault of CW by stabbing outside of the Haney Bar in Maple Ridge, B.C. - are set out in detail in the Affidavit of FACT of Kris Mouland.  The Crown will be able to prove all of the elements of these offences, based on the available evidence:

    a.   **Attempted Murder of PD**

        i.   That TEIXEIRA attempted to murder PD in that he had the intent to murder PD and that he did something with the purpose of carrying out that intention, which was to stab PD in the jugular vein with a knife.

        ii.   The evidence of witness / victim CW, who observed a male known to him as "Colby" stop the taxi he was in with PD, slam the cab door on PD's ankle, and square off for a fight with PD.  He observed "Colby" stab PD in the neck with a black knife with a 3-4" blade.

iii.    That TEIXEIRA was the stabber as he had introduced himself to witnesses that evening as "Colby", a known alias of TEIXEIRA. The identity of TEIXEIRA is further established by the evidence of police agent ▉ who was able to identify TEIXEIRA on CCTV footage from the Haney Bar, and is also able to associate TEIXEIRA with the nickname "Colby".

iv.    Witness CS identified TEIXEIRA in a photopack as a person who looked similar to the person who stabbed PD and CW.

v.    The CCTV footages establishes that the person identified as TEIXEIRA appeared to strike PD in the neck, and that blood then spurted out from PD onto the ground.

vi.    Medical evidence will establish that as a result of this stabbing, PD lost 80% of his blood, lost his pulse three times and remained on life support for two weeks. He experienced organ failure and required multiple surgeries.

**b.  Aggravated Assault of CW**

i.    That TEIXEIRA committed the offence – the stabbing of CW was captured by CCTV at the door area of the Haney Bar. In addition, witness CS was able to make a qualified identification of TEIXEIRA as the stabber from a photopack. The CCTV footage from the Haney bar was viewed by police agent ▉ who was able to identify TEIXEIRA as the attacker. CW advised that the attacker had used a black knife with a 3-4" blade.

ii.    That the offence happened at the time and place as specified in the Information – as established by the evidence of CW in relation to his stabbing.

iii.    That TEIXEIRA applied force and intended to apply force to CW, as established by the footage of the attack and the evidence of CW, PD, and witness bystanders.

iv.    That CW did not consent to the application of force and that TEIXEIRA knew that CW did not consent to the application of force – as established by the evidence of CW, PD, the footage of the assault, and the altercation leading up to the assault.

12

     v.     That the assault by TEIXEIRA wounded, maimed, disfigured, or endangered the life of CW and that a reasonable person would inevitably have realized that such an assault would subject CW to the risk of bodily harm – as established by the evidence of CW, the footage of the assault, and the evidence of the ambulance attendants and physicians who treated CW for life-threatening stab injuries.

52.    The *Criminal Code* contains several provisions related to the charges on this Information. All *Criminal Code* provisions relevant to this Information are set out in full and attached to this Affidavit as **Exhibit C**.

53.    Sections 268(2) and 239(1)(b) of the *Criminal Code* of Canada were in full force and effect on August 23, 2015, the date of the commission of the offences alleged in this extradition request, and continue to be in effect.

**Punishment**

54.    All of the offences listed on this Information are punishable by a term of imprisonment exceeding one year.

55.    The maximum penalty for the offence of Attempted Murder is prescribed by s. 239(1)(b) of the *Criminal Code*, and is imprisonment for life.

56.    The maximum punishment for the Offence of Aggravated Assault is prescribed by s.268(2) of the *Criminal Code*, and is 14 years imprisonment.

57.    The punishment provisions of the *Criminal Code* relating to the offences charged on Information #103266-1 are also set out in **Exhibit C** attached to this Affidavit.

## G.    OPINION

58.    In Canada, there is no statutory limitation period of general application in respect of indictable offences. As a result, an indictable offence may be initiated at any time and is not barred by any time limitations.

59.    In Canada, in order to convict an accused person, the trier of fact must be satisfied that the guilt of the accused has been established beyond a reasonable doubt.

60.    I have read and reviewed the Informations charging the accused, TEIXEIRA with the counts as set out above (**Exhibits A, D, and F**). I have read and reviewed the warrants of arrest of the accused, TEIXEIRA, issued in respect of these Informations (**Exhibits B, E, and G**). I have read and reviewed the Affidavit of FACT, filed in support of this extradition request, and the exhibits appended thereto.

61.    In my opinion, the evidence set out in the Affidavit of FACT, filed in support of this extradition request and relating to the above-noted charges, establishes a *prima facie* case upon which a reasonable jury, properly instructed, could be satisfied beyond a reasonable doubt and convict the accused, TEIXEIRA, of the charges set out in **Exhibits A, D, and F** attached to this affidavit and paragraph 1 above.

62.    The offences on which TEIXEIRA's extradition is sought are extraditable offences. They are not political offences or offences of a political character. The offences were not charged for the purpose of prosecuting TEIXEIRA on account of his race, religion, nationality or political opinion, and TEIXEIRA will not be prejudiced by reason of his race, religion, nationality or political opinion.

63.    This affidavit is made in support of a request for the extradition of TEIXEIRA and for no improper purpose.

Affirmed before me at the City of Vancouver, in )
the Province of British Columbia, Canada, this )
15ᵗʰ day of January, 2020 )
)
)

A Commissioner for taking affidavits in the
Province of British Columbia

Dianne M. Wiedemann

Caroline Richardson
BC Prosecution Service
Ministry of Attorney General
6ᵗʰ Floor, 865 Hornby Street
Vancouver, BC   V6Z 2G3

Barrister and Solicitor
A commissioner for oaths in British Columbia

14

# EXHIBIT A

This is Exhibit " A " referred to in the

Affidavit of.....D.\.Chase..2:19.in.00200-CKD   Document 14-1   Filed 02/19/20   Page 21 of 85

Sworn before me at Vancouver ......**INFORMATION / DÉNONCIATION**

in the Province of British Columbia,

this.15.. day of...Januany..A.D. 20.20

.........T....Chase.....

*A Commissioner for taking affidavits*
*within the Province of British Columbia*
PROVINCE OF BRITISH COLUMBIA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

| Court Identifier: | **3585: PRA** |
| Court File Number: | **230175** |
| Type Reference: | C |
| Inf. Seq Number: | **2** |
| Agency File Number: | **IHI:17-1584** |

DNA: ☒    SOR: ☐    K File: ☐

## "By Indictment"

This is the information of / Les présentes constituent la dénonciation de Kris Mouland, a / un(e) Peace Officer (the "Informant" / le "Dénonciateur") of / de **Surrey**, British Columbia / Colombie-Britannique.

The informant says that the informant has reasonable and probable grounds to believe and does believe that / Le dénonciateur déclare qu'il a des motifs raisonnables et probables et croit effectivement que

### Count 1

Brandon Nathan TEIXEIRA, on or about the 23rd day of October, 2017, at or near Surrey, in the Province of British Columbia, did, while using a firearm in the commission of the offence, commit the first degree murder of N████ K████, contrary to Section 235(1) of the Criminal Code.

### Count 2

Brandon Nathan TEIXEIRA, on or about the 23rd day of October, 2017, at or near Surrey, in the Province of British Columbia, did attempt to commit the murder of Person A by discharging a restricted firearm at Person A, and thereby wounding her, contrary to section 239(1)(b) of the Criminal Code.

### Count 3

Brandon Nathan TEIXEIRA, on or about the 23rd day of October, 2017, at or near Surrey, in the Province of British Columbia, did discharge a firearm with intent to wound, maim, disfigure, and/or endanger the life of Person A, contrary to Section 244(1)of the Criminal Code.

THE INFORMATION SWORN ON **DECEMBER 20, 2019** CONTAINS A TOTAL OF 3 COUNTS ON 1 PAGE.

SWORN BEFORE ME / ASSERMENTÉ DEVANT MOI
ON / CE **20TH** DAY OF / JOUR DE **DECEMBER, 2019**
AT / Á **SURREY**
BRITISH COLUMBIA / COLOMBIE-BRITANNIQUE

othersigner11
Fri Dec 20 2019 13:49:50  K M̲u̲t̲a̲l̲

SIGNATURE OF INFORMANT /
SIGNATURE DU DÉNONCIATEUR

**Brandon Nathan TEIXEIRA: Warrant**
**PROCESS / ACTE DE PROCÉDURE ISSUED**

**A. Ferguson** 2019.12.20 13:50:00 -08'00'

A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA /
UN JUGE DE PAIX DANS ET POUR LA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

**A. Ferguson** 2019.12.20 13:54:40 -08'00'

A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA /
UN JUGE DE PAIX DANS ET POUR LA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

# EXHIBIT B

# Warrant for Arrest

**In the Provincial Court**

Canada: Province of British Columbia

Ban - none

Police File No.
IHI:17-1584

Court File No.
3585:230175-2-C

Primary Enf. Agency:

D.O.B.: ▮▮▮▮ 1991

To the Peace Officers in the Province of British Columbia:

This warrant is issued for the arrest of **Brandon Nathan Teixeira** of 20-15938 27Th Ave, Surrey, BC, Canada  referred to in this warrant as the accused. Because the accused has been charged with the following offence(s):
**Count 1, on or about October 23, 2017, at or near Surrey BC, did commit an offence of Murder, contrary to section 235(1) Criminal Code.**

**Count 2, on or about October 23, 2017, at or near Surrey BC, did commit an offence of attempt murder, contrary to section 239 (1)(b) Criminal Code.**

**Count 3, on or about October 23, 2017, at or near Surrey BC, did commit an offence of discharge a firearm w/intent to wound/ disfigure, contrary to section 244(1) Criminal Code.**

See a total of 3 Charges

This is Exhibit " B " referred to in the
Affidavit of Dianne Wiedemann
Sworn before me at Vancouver
in the Province of British Columbia,
this 15 day of January A.D. 20 20
........ C. Charlton .........
*A Commissioner for taking affidavits*
*Within the Province of British Columbia*

And because:

**there are reasonable and probable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused. 507(4), 512(1)**

You are therefore ordered, in Her Majesty's name, to immediately arrest the accused and bring them before any Justice/Judge in and for the Province of British Columbia to be dealt with according to law.

Dated / Fait le **December 20, 2019**
   at / à **Surrey**
     British Columbia / Colombie-Britannique

**A. Ferguson** 2019.12.20 13:56:40 -08'00'

A Clerk of the Court on behalf of / Un greffier du tribunal au nom du Justice of the Peace / Juge de paix A Ferguson, in and for the Province of British Columbia / dans et pour la province de la Colombie-Britannique

## Endorsement of Warrant

**CANADA: Province of  British Columbia - Form 29 (Section 507)**  Whereas this warrant is issued under section 507, 508 or 512 of the *Criminal Code* in respect of an offence other than an offence mentioned in section 522 of the *Criminal Code*, I hereby authorize the release of the accused pursuant to section 499 of that Act.

Dated

at          British Columbia     A Justice of the Peace in and for the Province of British Columbia

| Warrant Cancelled (Return to Registry) | | | Warrant Executed (Return to Registry and attach original bail document if applicable) |
|---|---|---|---|
| by | | | |
| Person contacted | | | by |
| by phone at | m. Date | | Date |
| Reason | | Bail reinstated | |

PCR014
Form 7
Rev 12/2019  AF13:56-20.12.2019

**Police**

Page 1 of 2

(CC) Warrant for Arrest (adult)

# EXHIBIT C

This is Exhibit " *C* " referred to in the
Affidavit of... *Dianne Wiedema un*
Sworn before me at ... *Vancouu*
in the Province of British Columbia,
this...*15*... day of ...*Janury*......A.D. 20.*20*.
...........
*A Commissioner for taking affidavits
Within the Province of British Columbia*

Criminal Code, R.S.C., 1985, c. C-46

Relevant Provisions

## A. **Murder**

1.    The *Criminal Code* defines homicide, culpable homicide, and murder. The relevant sections are as follows:

**Homicide**

222. (1) A person commits homicide when, directly or indirectly, by any means, he causes the death of a human being.

(2) Homicide is culpable or not culpable.

(3) Homicide that is not culpable is not an offence.

(4) Culpable homicide is murder or manslaughter or infanticide.

(5) A person commits culpable homicide when he causes the death of a human being,

> (a) by means of an unlawful act;

> (b) by criminal negligence;

> (c) by causing that human being, by threats or fear of violence or by deception, to do anything that causes his death; or

> (d) by willfully frightening that human being, in the case of a child or sick person.

(6) Notwithstanding anything in this section, a person does not commit homicide within the meaning of this Act by reason only that he causes the death of a human being by procuring, by false evidence, the conviction and death of that human being by sentence of the law.

**Murder**

229. Culpable homicide is murder

(a) where the person who causes the death of a human being

> (i) means to cause his death, or

> (ii) means to cause him bodily harm that he knows is likely to cause his death, and is reckless whether death ensues or not;

(b) where a person, meaning to cause death to a human being or meaning to cause him bodily harm that he knows is likely to cause his death, and being reckless whether death ensues or not, by

Criminal Code, R.S.C., 1985, c. C-46

Relevant Provisions

accident or mistake causes death to another human being, notwithstanding that he does not mean to cause death or bodily harm to that human being; or

(c) where a person, for an unlawful object, does anything that he knows or ought to know is likely to cause death, and thereby causes death to a human being, notwithstanding that he desires to effect his object without causing death or bodily harm to any human being.

2.      In Canada, the offence of murder is divided into two classes: first degree murder and second degree murder. The section defining second degree murder is as follows:

**Classification of murder**

231. (1) Murder is first degree or second degree murder.

(2) Murder is first degree murder when it is planned and deliberate.

[ ... ]

(7) All murder that is not first degree murder is second degree murder.

3.      The punishment for murder is life imprisonment. The section setting out this punishment is s. 235 which states:

**Punishment for murder**

235. (1) Every one who commits first degree murder or second degree murder is guilty of an indictable offence and shall be sentenced to imprisonment for life.

(2) For the purposes of Part XXIII, the sentence of imprisonment for life prescribed by this section is a minimum punishment.

4.      In relation to persons who were over the age of eighteen at the time of the offence, section 745(c) of the *Criminal Code* also provides that a person who has been convicted of second degree murder be sentenced to imprisonment for life "without eligibility for parole until the person has served at least 10 years of the sentence or such greater number of years, not being more than 25 years, as has been substituted therefor pursuant to s. 745.4". Section 745.4 grants the sentencing judge the discretion to fix a period of parole ineligibility between 10 and 25 years for a person convicted of second degree murder.

Criminal Code, R.S.C., 1985, c. C-46

Relevant Provisions

There are also provisions in the *Criminal Code* allowing for an application by the person for a judicial review of the period of parole ineligibility, as long as certain conditions stated in s. 745.6 are met (including a condition that the person has served at least fifteen years of the sentence.)

## B. **Attempt to Commit Murder**

5.      The *Criminal Code* defines attempt as follows:

> **Attempts**
>
> 24. (1) Every one who, having an intent to commit an offence, does or omits to do anything for the purpose of carrying out the intention is guilty of an attempt to commit the offence whether or not it was possible under the circumstances to commit the offence.
>
> (2) The question whether an act or omission by a person who has an intent to commit an offence is or is not mere preparation to commit the offence, and too remote to constitute an attempt to commit the offence, is a question of law.

6.      The punishment provisions relating to attempt murder are found in s.239(1) of the *Criminal Code*.

> **Attempt Murder**
>
> 239 (1) Every person who attempts by any means to commit murder is guilty of an indictable offence and liable
>
> (a) if a restricted firearm or prohibited firearm is used in the commission of the offence or if any firearm is used in the commission of the offence and the offence is committed for the benefit of, at the direction of, or in association with, a criminal organization, to imprisonment for life and to a minimum punishment of imprisonment for a term of
>
>> (i) in the case of a first offence, five years, and,
>>
>> (ii) in the case of a second or subsequent offence, seven years;
>
> (a.1) in any other case where a firearm is used in the commission of the offence, to imprisonment for life and to a minimum punishment of imprisonment for a term of four years; and
>
> (b) in any other case, to imprisonment for life.

Criminal Code, R.S.C., 1985, c. C-46

Relevant Provisions

C. **Aggravated Assault**

7.        Section 265 of the *Criminal Code* defines the underlying offence of assault.

> 265. (1) A person commits an assault when
>
>> (a) without the consent of another person, he applies force intentionally to that other person, directly or indirectly;
>>
>> (b) he attempts or threatens, by an act or a gesture, to apply force to another person, if he has, or causes that other person to believe on reasonable grounds that he has, present ability to effect his purpose; or
>>
>> […]
>
> (2) This section applies to all forms of assault, including sexual assault, sexual assault with a weapon, threats to a third party or causing bodily harm and aggravated sexual assault.
>
> (3) For the purposes of this section, no consent is obtained where the complainant submits or does not resist by reason of
>
>> (a) the application of force to the complainant or to a person other than the complainant;
>>
>> (b) threats or fear of the application of force to the complainant or to a person other than the complainant;
>>
>> (c) fraud; or
>>
>> (d) the exercise of authority.

8.        Section 268(1) of the *Criminal Code* defines the offence of aggravated assault.

> 268(1) Every one commits an aggravated assault who wounds, maims, disfigures or endangers the life of the complainant.

9.        The punishment provision relating to s.268(1) is found in s.268(2) of the *Criminal Code.*

> 268(2) Every one who commits an aggravated assault is guilty of an indictable offence and liable to imprisonment for a term not exceeding fourteen years.

Criminal Code, R.S.C., 1985, c. C-46

Relevant Provisions

## D.  **Discharge a Firearm with Intent**

10.     Section 244(1) of the *Criminal Code* defines the offence of discharging a firearm with intent.

> 244 (1) Every person commits an offence who discharges a firearm at a person with intent to wound, maim or disfigure, to endanger the life of or to prevent the arrest or detention of any person — whether or not that person is the one at whom the firearm is discharged.

11.     The punishment provisions relating to s.244(1) are found in s.244(2), (3), and (4) of the *Criminal Code.*

> 244 (2) Every person who commits an offence under subsection (1) is guilty of an indictable offence and liable
>
> > (a) if a restricted firearm or prohibited firearm is used in the commission of the offence or if the offence is committed for the benefit of, at the direction of, or in association with, a criminal organization, to imprisonment for a term not exceeding 14 years and to a minimum punishment of imprisonment for a term of
> >
> > > i)   in the case of a first offence, five years, and
> > >
> > > ii)  in the case of a second or subsequent offence, seven years; and
> >
> > (b) in any other case, to imprisonment for a term not exceeding 14 years and to a minimum punishment of imprisonment for a term of four years.

## E.  **Uttering Threats**

12.     Section 264.1(1) of the *Criminal Code* defines the offence of uttering threats.

> 264.1 (1) Every one commits an offence who, in any manner, knowingly utters, conveys or causes any person to receive a threat
>
> > (a) to cause death or bodily harm to any person;
> >
> > (b) to burn, destroy or damage real or personal property; or
> >
> > (c) to kill, poison or injure an animal or bird that is the property of any person.

Criminal Code, R.S.C., 1985, c. C-46

Relevant Provisions

13.    The punishment provisions relating to s.264.1 (1) are found in s.264.1(2) and (3) of the *Criminal Code.*

> 264.1 (2) Every one who commits an offence under paragraph (1)(a) is guilty of
>
>  (a) an indictable offence and liable to imprisonment for a term not exceeding five years; or
>
>  (b) an offence punishable on summary conviction.
>
> 264.1 (3) Every one who commits an offence under paragraph (1)(b) or (c)
>
>  (a) is guilty of an indictable offence and liable to imprisonment for a term not exceeding two years; or
>
>  (b) is guilty of an offence punishable on summary conviction.

**F.  Assault With a Weapon**

14.    Section 265 of the *Criminal Code* defines the underlying offence of assault.

> 265. (1) A person commits an assault when
>
>  (a) without the consent of another person, he applies force intentionally to that other person, directly or indirectly;
>
>  (b) he attempts or threatens, by an act or a gesture, to apply force to another person, if he has, or causes that other person to believe on reasonable grounds that he has, present ability to effect his purpose; or
>
>  […]
>
> (2)  This section applies to all forms of assault, including sexual assault, sexual assault with a weapon, threats to a third party or causing bodily harm and aggravated sexual assault.
>
> (3)  For the purposes of this section, no consent is obtained where the complainant submits or does not resist by reason of
>
>  (a) the application of force to the complainant or to a person other than the complainant;

6

Criminal Code, R.S.C., 1985, c. C-46

Relevant Provisions

> (b) threats or fear of the application of force to the
>    complainant or to a person other than the complainant;
>
> (c) fraud; or
>
> (d) the exercise of authority.

15.     Section 267 of the *Criminal Code* defines the offence of assault with a weapon as well as its punishment.

> 267 Everyone who, in committing an assault,
>
> (a) carries, uses or threatens to use a weapon or an imitation
>    thereof, or
>
> (b) causes bodily harm to the complainant
>
> is guilty of an indictable offence and liable to imprisonment for a
> term not exceeding ten years or an offence punishable on
> summary conviction and liable to imprisonment for a term not
> exceeding eighteen months.

## G.  <u>Issue of Warrant for Arrest of Accused</u>

> 524 (1) Where a justice is satisfied that there are reasonable
> grounds to believe that an accused
>
> (a) has contravened or is about to contravene any summons,
>    appearance notice, promise to appear, undertaking or
>    recognizance that was issued or given to him or entered into
>    by him, or
>
> (b) has committed an indictable offence after any summons,
>    appearance notice, promise to appear, undertaking or
>    recognizance was issued or given to him or entered into by
>    him,
>
> he may issue a warrant for the arrest of the accused.

# EXHIBIT D

This is Exhibit " D " referred to in the
Affidavit of.....Dianne Wideman,

Sworn before me at .....Vancouver
in the Province of British Columbia,

this 15 ...day of...January...A.D. 20 20

.....................................................
A Commissioner for taking affidavits
Within the Province of British Columbia
CANADA
PROVINCE OF BRITISH COLUMBIA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

## INFORMATION / DÉNONCIATION

| Court Identifier: | **3585: PRA** |
|---|---|
| Court File Number: | **218442** |
| Type Reference: | |
| Inf. Seq Number: | **1** |
| Agency File Number: | **726:16-90528** |

DNA: ☒    SOR: ☐    K File: ☐

### "By Indictment"

This is the information of / Les présentes constituent la dénonciation de **Yme SMID**, a / un(e) Court Liaison Officer (the "Informant" / le "Dénonciateur") of / de **Surrey**, British Columbia / Colombie-Britannique.

The informant says that the informant has reasonable and probable grounds to believe and does believe that / Le dénonciateur déclare qu'il a des motifs raisonnables et probables et croit effectivement que

#### Count 1

Brandon Nathan TEIXEIRA, on or about the 26th day of June, 2016, at or near Surrey, in the Province of British Columbia, did commit aggravated assault of Redacted                , contrary to Section 268(2) of the Criminal Code.

#### Count 2

Brandon Nathan TEIXEIRA, on or about the 26th day of June, 2016, at or near Surrey, in the Province of British Columbia, in committing assault of Redacted              , did carry, use, or threaten to use a weapon or an imitation weapon, contrary to Section 267(a) of the Criminal Code.

#### Count 3

Brandon Nathan TEIXEIRA, on or about the 26th day of June, 2016, at or near Surrey, in the Province of British Columbia, did knowingly utter a threat to Redacted          , to cause death or bodily harm to Redacted              , contrary to Section 264.1(1) of the Criminal Code.

THE INFORMATION SWORN ON **SEPTEMBER 8, 2016** CONTAINS A TOTAL OF 3 COUNTS ON 1 PAGE.

SWORN BEFORE ME / ASSERMENTÉ DEVANT MOI

ON / CE **8TH** DAY OF / JOUR DE **SEPTEMBER, 2016**

AT / Á **SURREY**

BRITISH COLUMBIA / COLOMBIE-BRITANNIQUE

| Other Signer |
|---|
| Thu Sep 8 2016 12:52:40 |

SIGNATURE OF INFORMANT /
SIGNATURE DU DÉNONCIATEUR

**Brandon Nathan TEIXEIRA: Warrant Requested**
**PROCESS / ACTE DE PROCÉDURE  Warrant**
**PROCESS / ACTE DE PROCÉDURE  ISSUED**

**J. Morrison** 2016.09.08 12:52:51 -07'00'

A JUSTICE OF THE PEACE IN AND FOR THE PROVINCE OF BRITISH COLUMBIA / UN JUGE DE PAIX DANS ET POUR LA PROVINCE DE LA COLOMBIE-BRITANNIQUE

**J. Morrison** 2016.09.08 12:58:11 -07'00'

A JUSTICE OF THE PEACE IN AND FOR THE PROVINCE OF BRITISH COLUMBIA / UN JUGE DE PAIX DANS ET POUR LA PROVINCE DE LA COLOMBIE-BRITANNIQUE

# EXHIBIT E

ADDED: 18 - 11 - 24

**Warrant for Arrest**
**In the Provincial Court**
Canada: Province of British Columbia

REMOVED:

Ban - none

REASON:

PER:

Police File No. 726-16-90528

Court File No. 3585:218442-1

Primary Enf. Agency:

D.O.B.: ████ 1991

To the Peace Officers in the Province of British Columbia

Whereas **Brandon Nathan Teixeira**
of **10044 127B St, Surrey, BC, Canada V3V 1B3**

(the "accused") has been charged with the following offence(s):
**Count 1, on or about June 26, 2016, at or near Surrey BC, did commit an offence of aggravated assault, contrary to section 268(2) Criminal Code.**

**Count 2, on or about June 26, 2016, at or near Surrey BC, did commit an offence of assault with a weapon, contrary to section 267(a) Criminal Code.**

**Count 3, on or about June 26, 2016, at or near Surrey BC, did commit an offence of Uttering threats, contrary to section 264.1 (1) Criminal Code.**

See a total of 3 Charges

This is Exhibit " E " referred to in the
Affidavit of...... Dianne Wiedemann
Sworn before me at ..... Vancouver
in the Province of British Columbia,
this ...15... day of ... Jan ... A.D. 20.20
.........
*A Commissioner for taking affidavits*
*Within the Province of British Columbia*

And whereas:

**there are reasonable and probable grounds to believe that the accused has violated or is about to violate the recognizance upon which he/she was released (issued pursuant to section 524 of the Criminal Code).**

You are commanded, in Her Majesty's name, forthwith to arrest the accused and to bring him/her before any Justice/Judge in and for the Province of British Columbia to be dealt with according to law.

Dated / Fait le **November 22, 2018**
at / à **Surrey**
British Columbia / Colombie-Britannique

E. Zasada 2018.11.22 16:21:01 -08'00'

A Clerk of the Court on behalf of / Un greffier du tribunal au nom du Judge / Juge D H Weatherly, in and for the Province of British Columbia / dans et pour la province de la Colombie-Britannique

**Endorsement of Warrant**

**CANADA: Province of British Columbia - Form 29 (Section 507)** Whereas this warrant is issued under section 507, 508 or 512 of the *Criminal Code* in respect of an offence other than an offence mentioned in section 522 of the *Criminal Code*, I hereby authorize the release of the accused pursuant to section 499 of that Act.

Dated
at                                    British Columbia     A Justice of the Peace in and for the Province of British Columbia

original bail document if applicable)

Form 7
01/05      az16:20-22 11.2018

File, Police

Page 1 of 2

(CC) Warrant for Arrest (adult)

# EXHIBIT F

## INFORMATION / DÉNONCIATION

| | |
|---|---|
| Court Identifier: | **3531: PRA** |
| Court File Number: | **103266** |
| Type Reference: | |
| Inf. Seq Number: | **1** |
| Agency File Number: | **713:15-20700** |

DNA: ☒    SOR: ☐    K File: ☐

CANADA:
PROVINCE OF BRITISH COLUMBIA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

### "By Indictment"

This is the information of / Les présentes constituent la dénonciation de **Michael Gafka**, a / un(e) Peace Officer (the "Informant" / le "Dénonciateur") of / de **Maple Ridge**, British Columbia / Colombie-Britannique.

The informant says that the informant has reasonable and probable grounds to believe and does believe that / Le dénonciateur déclare qu'il a des motifs raisonnables et probables et croit effectivement que

#### Count 1

Brandon Nathan TEIXEIRA, on or about the 23rd day of August, 2015, at or near Maple Ridge, in the Province of British Columbia, did attempt to commit the murder of Redacted       , by stabbing him, contrary to section 239(1)(b) of the Criminal Code.

#### Count 2

Brandon Nathan TEIXEIRA, on or about the 23rd day of August, 2015, at or near Maple Ridge, in the Province of British Columbia, did commit aggravated assault of Redacted       , contrary to Section 268(2) of the Criminal Code.

#### Count 3

R█ K████████ on or about the 23rd day of August, 2015, at or near Maple Ridge, in the Province of British Columbia, was an accessory after the fact to the attempted murder of Redacted       , contrary to Sections 239(1)(b) and 463(a) of the Criminal Code.

#### Count 4

R█ K████, on or about the 23rd day of August, 2015, at or near Maple Ridge, in the Province of British Columbia, was an accessory after the fact to the aggravated assault of Redacted       , contrary to Sections 268(2) and 463(b) of the Criminal Code.

#### Count 5

S█████ C████████, on or about the 24th day of August, 2015, at or near Langley, in the Province of British Columbia, was an accessory after the fact to the attempted murder of Redacted       , contrary to Sections 239(1)(b) and 463(a) of the Criminal Code.

This is Exhibit " F " referred to in the
Affidavit of......Dianne Wiedemann
Sworn before me at......Vancouver
in the Province of British Columbia,
this......1st......day of......January......A.D. 20 20
......................................................
*A Commissioner for taking affidavits*
*Within the Province of British Columbia*

Page 1 of 2

## INFORMATION / DÉNONCIATION

| | |
|---|---|
| Court Identifier: | **3531: PRA** |
| Court File Number: | **103266** |
| Type Reference: | |
| Inf. Seq Number: | **1** |
| Agency File Number: | **713:15-20700** |

CANADA:
PROVINCE OF BRITISH COLUMBIA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

DNA: ☒     SOR: ☐     K File: ☐

**"By Indictment"**

**Count 6**

S███████ C██████ , on or about the 24th day of August, 2015, at or near Langley, in the Province of British Columbia, was an accessory after the fact to the aggravated assault of Redacted , contrary to Sections 268(2) and 463(b) of the Criminal Code.

THE INFORMATION SWORN ON **DECEMBER 5, 2019** CONTAINS A TOTAL OF 6 COUNTS ON 2 PAGES.

SWORN BEFORE ME / ASSERMENTÉ DEVANT MOI
ON / CE **5TH** DAY OF / JOUR DE **DECEMBER, 2019**
AT / Á **PORT COQUITLAM**
BRITISH COLUMBIA / COLOMBIE-BRITANNIQUE

Other Signer 3
Thu Dec 5 2019 11:28:29

SIGNATURE OF INFORMANT /
SIGNATURE DU DÉNONCIATEUR

S████ C██████ , R██ K████████ , **Brandon Nathan**
**TEIXEIRA: Warrant**
**PROCESS / ACTE DE PROCÉDURE ISSUED**

D. Mills 2019.12.05 11:28:42 -08'00'

A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA /
UN JUGE DE PAIX DANS ET POUR LA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

D. Mills 2019.12.05 11:28:47 -08'00'

A JUSTICE OF THE PEACE IN AND FOR THE
PROVINCE OF BRITISH COLUMBIA /
UN JUGE DE PAIX DANS ET POUR LA
PROVINCE DE LA COLOMBIE-BRITANNIQUE

# EXHIBIT G

**Warrant for Arrest**

**In the Provincial Court**

Canada: Province of British Columbia

Ban - none

Police File No.
713:15-20700

Court File No.
3531:103266-1

Primary Enf. Agency:

D.O.B.: ■■■ 1991

To the Peace Officers in the Province of British Columbia

Whereas **Brandon Nathan Teixeira**
of .

(the "accused") has been charged with the following offence(s):

**Count 1, on or about August 23, 2015, at or near Maple Ridge BC, did commit an offence of attempt murder, contrary to section 239(1)(b) Criminal Code.**

**Count 2, on or about August 23, 2015, at or near Maple Ridge BC, did commit an offence of aggravated assault, contrary to section 268(2) Criminal Code.**

**See a total of 2 Charges**

This is Exhibit " G " referred to in the

Affidavit of...... Dianne Wiedemann

Sworn before me at ...... Vancouver
in the Province of British Columbia,

this 15th day of January A.D. 20 20

.................................................
*A Commissioner for taking affidavits*
*Within the Province of British Columbia*

**COPY**

And whereas:

**there are reasonable and probable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused**

You are commanded, in Her Majesty's name, forthwith to arrest the accused and to bring him/her before any Justice/Judge in and for the Province of British Columbia to be dealt with according to law.

Dated / Fait le **December 5, 2019**

at / à **Port Coquitlam**

British Columbia / Colombie-Britannique

**D. Mills**   2019.12.05 15:11:45
-08'00'

Justice of the Peace / Juge de paix D Mills, in and for the Province of British Columbia /
dans et pour la province de la Colombie-Britannique

---

**Endorsement of Warrant**

**CANADA: Province of British Columbia - Form 29 (Section 507)** Whereas this warrant is issued under section 507, 508 or 512 of the *Criminal Code* in respect of an offence other than an offence mentioned in section 522 of the *Criminal Code*, I hereby authorize the release of the accused pursuant to section 499 of that Act.

| Dated | |
|---|---|
| at | British Columbia   A Justice of the Peace in and for the Province of British Columbia |

| Warrant Cancelled (Return to Registry) | | | Warrant Executed (Return to Registry and attach original bail document if applicable) | |
|---|---|---|---|---|
| by | | | by | |
| Person contacted | | | Date | |
| by phone at | | m.  Date | | |
| Reason | | | Bail reinstated | |

PCR 014
Form 7
01/05   dm15:10-05.12.2019

**File, Police**

Page 1 of 2

(CC) Warrant for Arrest (adult)

## Mandat d'arrestation

### À la cour provinciale

Nu. de dossier de la police
713:15-20700

Nu. de dossier du greffe
3531:103266-1

Canada : Province de la Colombie-Britannique

Ban - none

Org. prim. d'app. de la loi :

D.D.N. : ▮▮▮▮ 1991

Aux agents de la paix de la province de la Colombie-Britannique

Attendu que **Brandon Nathan Teixeira**
de ,

(le (la) "prévenu(e)") a été inculpé(e) de l'(des) infraction(s) suivante(s) :
**Count 1, on or about August 23, 2015, at or near Maple Ridge BC, did commit an offence of attempt murder, contrary to section 239(1)(b) Criminal Code.**

**Count 2, on or about August 23, 2015, at or near Maple Ridge BC, did commit an offence of aggravated assault, contrary to section 268(2) Criminal Code.**

**Voyez 2 inculpations**



Et attendu :

**there are reasonable and probable grounds to believe that it is necessary in the public interest to issue this warrant for the arrest of the accused**

Vous êtes enjoint(e), au nom de Sa Majesté, d'arrêter immédiatement ledit (ladite) prévenu(e) et de l'amener devant un juge de paix/ juge dans et pour la province de la Colombie-Britannique, pour qu'il (elle) doit traité(e) selon la loi.

| Visa du mandat | |
|---|---|
| **CANADA: Province de la Colombie-Britannique - Formulaire 29** (Article 507) Attendu que le présent mandat est décerné en vertu des articles 507, 508 ou 512 du *Code criminel*, relativement à une infraction autre que celles visées à l'article 522, j'autorise par les présentes la **mise en liberté du prévenu en application de l'article 499 de cette loi.** | |
| Fait le | |
| à                                          Colombie-Britannique | Un juge de paix dans et pour la province de la Colombie-Britannique |

| Mandat annulé (Retourner au greffe) | | Mandat éxécuté (Retourner au greffe le plus tôt possible et y joindre le document original de mise en liberté sous caution s'il y a lieu) |
|---|---|---|
| par | | |
| Personne contactée | | par |
| au téléphone à          m.  Date | | Date |
| Raison | Cautionnement remis en vigueur | |

PCR 014
Form 7
01/05    dm15:10-05.12.2019

**File, Police**

Page 2 of 2

**(CC) Mandat d'arrestation (adulte)**

| | | |
|---|---|---|
| CANADA | ) | HER MAJESTY THE QUEEN |
| | ) | |
| PROVINCE OF BRITISH COLUMBIA | ) | v. |
| | ) | |
| VANCOUVER REGISTRY | ) | BRANDON NATHAN TEIXEIRA |
| | ) | |

**IN THE MATTER of a request by Canada for the Extradition of Brandon Teixeira from the United States of America who stands charged in Canada with Offences under the *Criminal Code* of Canada.**

---

### AFFIDAVIT OF FACT OF
### KRIS MOULAND

---

I, Kris MOULAND, of the City of Surrey, in the Province of British Columbia, Canada MAKE OATH AND SAY:

1.   That I am a police officer with the rank of Corporal and have been employed as a member of the Royal Canadian Mounted Police ("RCMP") for 15 years. The RCMP is the National Police Force of Canada. I am presently attached to the Integrated Homicide Investigation Team in Surrey, British Columbia, Canada.

2.   I have personal knowledge of the matters and facts to which I depose in this Affidavit save and except where such facts are stated to be on information and belief, in which case, I believe them to be true.

## INTRODUCTION

**OVERVIEW**

3.  This Affidavit relates to the following offences which all occurred in the Province of British Columbia, Canada alleged to have been committed by Brandon TEIXEIRA ("TEIXEIRA"), date of birth ███████ 1991 and for which extradition is sought:

    a.  Surrey Information 230175-2-C:

        i.   The murder of N█████ K█████ ("K█████") on October 23, 2017;

        ii.  The attempted murder of Person "A" on October 23, 2017;

        iii. Discharging a firearm with intent to wound Person "A" on October 23, 2017.

    b.  Surrey Information 218442-1:

        i.   The aggravated assault of D.C. by stabbing on June 26, 2016;

        ii.  In committing the assault of D.C., did carry, use, or threaten to use a weapon or imitation weapon on June 26, 2016;

        iii. Uttering threats towards D.C. on June 26, 2016.

    c.  Maple Ridge Information 103266-1:

        i.   The attempted murder of P.D. by stabbing on August 23, 2015;

        ii.  The aggravated assault of C.W. by stabbing on August 23, 2015.

4.  I became involved in these investigations on July 1, 2018 when I was assigned the role of File Coordinator for the murder of K█████ [Surrey Information 230175-2-C] and tasked with completing this investigation. The File Coordinator's role is to task out investigators as part of the investigative team, and oversee the electronic file management systems and disclosure of these investigations to the British Columbia Crown Counsel Service in preparation for Court proceedings. In fulfilment of this role, I have amongst other things, reviewed the investigation of these matters in their entirety,

including but not limited to all investigation reports, statements, exhibit reports, forensic and laboratory reports, and photographs and videos.

5. I have not been directly involved in the investigations relating to Surrey Information 218442-1 and Maple Ridge Information 103266-1, but I have reviewed the investigations of these matters in their entirety, including but not limited to all investigation reports, statements, exhibit reports, forensic and laboratory reports.

6. I have been investigating murders, serious crimes and crimes against persons exclusively for the past 7 years.

7. Due to witness safety concerns, when referring to victims and/or witnesses in each investigation, I have used initials or letters, for example "Person A".  Correspondingly, the Informations have been redacted and/or initials used such that the victim's names are not set out.

**DEFINITIONS**

8. Unless otherwise stated in this Affidavit, all locations referred to are in the Province of British Columbia, Canada ("BC") and the motor vehicle licence plate numbers are BC motor vehicle licence plate numbers.

9. Everything in square brackets "[ ]" represents either a comment, paragraph reference, my own interpretation of the information set out within the given sentence or paragraph, or adds further information to aid understanding or clarification of what has been set out. Also it was used to describe Holdback related evidence without referencing the specifics of that evidence to protect the integrity of the Holdback.

10. Police Records Information Management Environment ("PRIME") contains information in relation to police investigations, the originating agency and complete police investigational reports, along with specific entity particulars such as birth dates, telephone numbers, addresses and persons associated to the event.

11. Facebook is a free social networking website that allows registered users to create profiles, upload photos and videos, send messages and keep in touch with friends, family and colleagues.

12. Holdback Information, or "Holdback", is information or evidence that is determined to likely only be known by the suspect(s) in an investigation, apart from first responders. Once the investigative team identifies specific information or a piece of evidence as holdback, the details of it are closely guarded and may not even be shared with other police officers. Should an interviewee later speak about a piece of holdback, that person may then be considered a strong suspect.

## INVESTIGATIONS

**HOMICIDE OF N     K      – Surrey Information 230175-2-C**

### 911 CALLS AND INITIAL INVESTIGATION

13. On October 23, 2017, at 2:09 a.m. to 2:10 a.m., multiple 911 Calls were made regarding a shooting at 14339 36A Ave, Surrey ("Crime Scene 1").

14. Amongst other 911 callers, Person "A" reported that she had been shot, that she was with a friend who had been shot as well, and that he was probably dead. Person "A" had left the area of Crime Scene 1 and was parked in her vehicle on Highway 99 at Exit 10, Surrey ("Crime Scene 2").

### CRIME SCENE 1 (14339 36A Avenue, Surrey)

15. On October 23, 2017, Cst. Kenneth HO of the Surrey RCMP attended Crime Scene 1 and observed an East Indian male, short hair and beard, approximately 25 years of age, who was covered in blood, lying at the foot of the doorway.

16. The victim was able to move his hands out and responded only with the word "shot". Cst. HO observed several gunshot wounds.  The victim was unable to respond to any questions of what his name was or the nature of what happened.

17. British Columbia Emergency Health Services ("EHS") attended and treated the male. The victim lost consciousness and was transported by EHS to the Royal Columbian Hospital ("RCH") in New Westminster.

18. On October 23, 2017 at 5:15 a.m. at RCH, Dr. D███ B██████ declared the victim deceased.  [This victim was later identified as K██████.]

19. From the police examination at Crime Scene 1, it appeared as though the gun shots were fired near a grass boulevard between the curb/street, sidewalk and front lawn of the residence located at 14339 36A Avenue.

20. The grass boulevard extended from the east side of the driveway of 14399 36a Avenue, to the west side of the driveway of 14345 36a Avenue, Surrey BC.

21. After being shot, K██████ appeared to have made his way to the front entry way of 14399 36a Avenue, Surrey and was banging on the door. This is where K██████ was found by first responders. At the front entry, blood smears were observed that appeared consistent with a palm on the top left door window and on the door itself.  Blood transfer was located on the door bell, which was located on the left side of the entry.

**CRIME SCENE 2 (Highway 99/ Exit 10, Surrey)**

22. On October 23, 2017, at approximately 2:10 a.m., Cst. Katrina INACIO received an update that the female driver of a Mazda 3 had been shot and was by King George BLVD and exit 10 of Highway 99, Surrey [Crime Scene 2].

23. Cst. INACIO attended and located a sliver Mazda with one female occupant, identified as Person "A". Person "A" was suffering from a gunshot wound through her right upper thigh. She advised the following:

   a. She had been parked near the Esso Gas Station on Crescent Road near the roundabout;

   b. Her male friend [K██████] made a phone call while she was sleeping;

   c. She woke up to being shot at;

   d. She left her male friend [K██████ in the parking lot dying;

   e. She drove over the single lane road onto Highway 99 in the opposite side of traffic and got to exit 10 [Approximately one kilometer away].

24. On October 23, 2017 at 6:50 a.m. Person "A" was treated by hospital staff. Doctor T█ at RCH stated that the wound was from a single gunshot with an entry point on the right hip and exit point directly across on the left hip.

## CRIME SCENE 3 (8500 Block of 204 Street, Langley)

25. On October 23, 2017 at 2:36 a.m. Cpl. Kurt NEUMAN located a vehicle which had been consumed by the fire and appeared to be a Jeep Liberty.  It was parked at an angle facing southwest, to the south of 8485 204 Street, Langley. There were no licence plates affixed to the vehicle, nor found in the surrounding area.  The Vehicle Identification Number ("VIN") was not visible.

## WITNESS STATEMENTS

## STATEMENTS OF PERSON "A" (VICTIM)

26. On October 23, 2017, Person "A" made a statement to the police which can be summarized as follows:

   a. On October 23, 2017, Person "A" met up with K██████ and drove around White Rock;

b.   K██████ was talking on the telephone to a friend about meeting up. K██████ told Person "A" that his friend's name was 'Kobe. They decided to meet around the Esso Gas Station on Crescent Road, Surrey;

c.   Person "A" parked her vehicle behind the Esso at Crescent Road.  A black Jeep parked behind her vehicle.  A suspect wearing a dark hat and grey sweater walked to the passenger side of her vehicle.  K██████ left the vehicle and walked a short distance away with the suspect;

d.   K██████ and his friend were talking for approximately 30-40 minutes;

e.   Person "A" fell asleep with a scarf over her face;

f.   Person "A" woke up to the sound of gun shots and someone screaming, Person "A" assumed it was K██████

g.   She saw the suspect holding a handgun and firing at K██████ who was on the ground.  The suspect shooting at K██████ was at her passenger side door;

h.   He fired at her and her car – a bullet hit her;

i.   Person "A" left the area in her car, leaving K██████ behind, to get to a safe place to call 911;

j.   Person "A" described the suspect vehicle as a dark Jeep 'Cherokee';

k.   Person "A" described the suspect/K██████'s friend as:
   i.    Wearing a grey sweater and a hat;
   ii.   Having a bit of stubble on his face and light-skinned;
   iii.  K██████ spoke to the suspect in Punjabi slang;
   iv.   Average build, the same height as K██████ and the same age or slightly older;
   v.    Being on the passenger side of her vehicle and shooting her vehicle as she drove away;

l.   Person "A" had seen the suspect on one previous occasion:
   i.    Person "A" met this suspect at K██████'s house approximately two days before the shooting.  PERSON "A" was leaving K██████'s house at 5:30 a.m. and saw him in the house;
   ii.   The suspect was driving the same black Jeep at Crime Scene 1, as the one she had seen at K██████'s residence approximately two days prior;

iii.     Person "A" knew this person as 'Kobe'.

## PHOTOPACK PRESENTATION WITH PERSON "A"

27.   On November 2, 2017, at approximately 8:24 p.m., Cst. Jason LEE completed a photograph pack presentation [of 10 people] containing a photograph of TEIXEIRA to Person "A".

28.   After the photograph pack was completed, Cpl. Kanwar BAL spoke further with Person "A". Person "A" advised that the male she selected from the photograph pack was the male that shot K██████. The photo of TEIXEIRA identified by Person "A" is attached to this affidavit as Exhibit "A".

## INTERVIEW OF WITNESS "B"

29.   On June 4, 2018, Cst. Krysta TANNER conducted a Non-Jeopardy Interview ("NJI")[1] with Witness "B" in regards to the K██████ homicide.

30.   Witness "B" eventually agreed to cooperate with the police investigation and become a "Police Agent", meaning that he acted under the instruction and direction of the RCMP to further their investigation, including wearing a wire and participating in meetings with TEIXEIRA and others.

31.   Witness "B" stated that prior to becoming a Police Agent, he participated with TEIXEIRA in the planning and preparation for the murder of K██████. He also stated that he was present when TEIXEIRA killed K██████. Witness "B" stated that he learned the

---

[1] An NJI is a statement taken from a witness when the witness is being considered for an Immunity Agreement (either full or limited) and is taken after the witness has obtained independent legal advice. The witness is advised that 1) it is imperative that he tell the truth, 2) anything he says cannot be used against him in trial of the offence being investigated or prosecuted but if he lies it may be used to prosecute him for perjury or obstructing justice; 3) although the information he provides cannot be used against him, the information is not confidential and will eventually have to be disclosed to anyone who is charged with the offence being investigated or prosecuted; and 4) the information will not, however, be disclosed until the police have taken any necessary precautions for the safety of the witness or his family.

following information directly from TEIXEIRA [note that some details have been removed to protect the integrity of the investigation]:

a.  Shortly before the murder of K████, TEIXEIRA was hanging out with K████ at K████'s residence, when the two of them were shot at outside of K████'s residence.  TEIXEIRA felt that K████ had set him up, and subsequently wanted to kill him;

b.  TEIXEIRA spoke with his associate R██ K████ ("K████"), who advised that there was an outstanding $160,000 contract from K████ to kill K████;

c.  K████ supplied a black Jeep Liberty ("K████ Jeep") to be used in the shooting.  When TEIXEIRA picked it up, it already had a jerry can with gas and [a gun] in the back.  TEIXEIRA thought that the Jeep Liberty was "a piece of shit" and was worried it would break down.  He had access to a black Jeep Cherokee that his roommate R██ P████████ ("P████████ Jeep") had rented to use for drug dealing, so they planned to use the P████████ Jeep for the shooting, and to burn the K████ Jeep near the crime scene, so that police would think it was the vehicle used in the shooting.

32.  Witness "B" advised the police that he was present for, and knows first-hand, the following:

a.  He stole the plates for the K████ Jeep;

b.  On the night of the shooting, TEIXEIRA arranged to meet with K████ on the premise to buy fireworks from him.  TEIXEIRA and Witness "B" drove to meet K████ in a cul-de-sac, and parked directly behind K████, who was in his girlfriend's car [Person "A"];

c.  K████ and TEIXEIRA talked for about 20-30 minutes outside of the vehicles.  Witness "B" remained hiding in the passenger side footwell of the vehicle the entire time.  When K████ opened the door of his girlfriend's car to get something, TEIXEIRA took the [gun] out of his waistband and shot K████ in the back.  K████'s girlfriend was also shot;

d.  The girl "punched the gas" and "fucked off right away". TEIXEIRA fired three or four more shots at K███████. K███████ started running towards a house. TEIXEIRA continued to shoot at K███████;

e.  TEIXEIRA returned to the Jeep, and he and Police Agent Witness "B" drove away, with TEIXEIRA driving;

f.  They disposed of the [gun] that night, and also burned the Jeep Liberty, as they knew someone would report the suspect vehicle as being dark in colour. They subsequently saw on the news that K███████ had died, and that his girlfriend [Person "A"] had survived.

**AUTOPSY OF K███████**

33.  On October 26, 2017 at 10:30 a.m., Cpl. Gerlind SPEKAT attended Vernon Jubilee Hospital Morgue in Vernon with Global Transport, who had transported the body of K███████ from RCH. At 4:00 p.m., the autopsy was concluded and Dr. ███████ advised that the cause of death was multiple gunshot wounds and [Holdback Evidence].

**MEDICAL RECORDS OF PERSON "A"**

34.  The Fraser Health medical records of Person "A" dated November 14, 2017 obtained by consent indicates that Person "A" sustained gunshot wounds to the left and right thighs.

**AGGRAVATED ASAULT *ET AL*. OF D. C. – Surrey Information 218442-1**

**911 CALLS AND INITIAL ATTENDENCE**

35.  On June 26, 2016, at approximately 1:11 a.m., police received 911 calls that a bouncer had been stabbed at the Tap House bar located at 15330 102A Avenue, in Surrey, British Columbia. Several police officers were dispatched, locating the victim, D.C., suffering from several stab wounds and subsequently speaking to various witnesses, who were all staff members of the Tap House.

36. From the evidence of a number of witnesses at the Tap House, the theory of the police is that TEIXEIRA was angry at D.C, a bouncer, for refusing him entry.  He later returned to the pub and stabbed D.C. The identification of TEIXEIRA is from a combination of the witnesses who described the stabber, some of whom identified TEIXEIRA from a Facebook photo and a photograph lineup, and also the Closed Circuit Television ("CCTV") footage at the Tap House.

## WITNESS STATEMENTS

**STATEMENT OF D.C. (VICTIM)**

37. On June 26, 2016, at 1:14 a.m., Cst. Shaun VAN BREUGAL attended the Tap House and followed the ambulance to RCH, where the victim, D.C., was brought to a trauma room.  Cst. VAN BREUGAL photographed D.C.'s injuries, which consisted of six knife wounds to his head, neck, shoulders, and wrist.  D.C. signed a consent form for the release of his medical records.

38. On June 26, 2016, Cst. Navraj UPPAL attended the hospital and obtained a recorded audio statement from D.C., who stated the following:

    a.   He is a bouncer at the Taphouse Bar;

    b.   The suspect came by earlier in the night and wanted to go inside to talk to the bartender;

    c.   The suspect appeared to be high on cocaine;

    d.   D.C told the suspect that his clothing did not match the required dress code and he could not enter due to the dress code;

    e.   The suspect left and tried to get into smoking area;

    f.   Other staff saw him and they got into a pushing match;

    g.   D.C. pushed him out and went back inside the bar;

    h.   The suspect returned in a the white Mercedes SUV;

    i.   The suspect ran towards D.C. and began stabbing him;

    j.   The suspect ran away;

k.   D.C. sat down as he began to faint;

l.   D.C. saw blood coming down his wrist and felt a pinch on his shoulders.

## STATEMENT OF A.R.

39.   On June 26, 2016, at 2:18 a.m., Cst. Ryan MUNTENER obtained a digitally recorded audio statement from witness, A. R., who came out to assist the bouncers during their first interaction with the suspect.  A.R. stated the following:

a.   He worked as a manager at the Tap House;

b.   He went outside and spoke with the suspect who was causing a scene because he had been denied entry to the bar because of his dress;

c.   The suspect went by the name 'Tony';

d.   The suspect was upset at D.C.;

e.   He spoke with the suspect who calmed down and then left with another male and female, though the suspect was threatening to come back and get them;

f.   He described the suspect as Caucasian male, 24-28 years old, 5'8" tall, 190 pounds, with brown hair that was shaved on the sides and short on top;

g.   The suspect wore navy blue Nike track pants, with a Nike logo under the left pocket;

h.   He had a white Underarmour shirt on with long sleeves that had a grey Underarmour logo on the left chest, and grey striping around the arms where the stitching would be;

i.   He had black and white or grey and white running shoes on;

j.   He did not notice any jewellery or tattoos on the suspect;

k.   The suspect had his right index finger wrapped in a white bandage;

l.   He did not see the stabbing or when the suspect came back the second time.

## STATEMENT OF L.B.

40.   On June 26, 2016 at 2:19 a.m. Cst. Tracy KERINS took a recorded statement from L.B., a Tap House employee.  L.B. stated the following:

a.  There is a group of regular patrons (all males) who have special courtesy extended to them meaning they do not have to line up to get into the establishment.  This group came to the Taphouse tonight.  One of the males in the group is known to him as "T█."  Later on, the regular patrons group came outside and asked if their friends could be allowed into the bar.  At about 12:30 a.m. the regular patrons group waved the friends group to the pub.  The friends group turned out to be a big group (6 - 8), who were not dressed according to the dress code.  L.B. told the friend group that they were not dressed appropriately and they began to argue.  The friends group left the front entrance way and the regular patrons group went back inside;

b.  A few minutes later the friends group tried to enter the bar through the smoking area.  L.B. again told them they were not allowed in due to their dress.  About half the friends group left but the suspect tried to push his way inside.  The suspect was yelling and wrestling with D.C.  L.B. separated them and sent D.C. inside.  The suspect yelled, "I'll come find you" and "you don't know who I am."  The suspect then left the bar;

c.  About 30 - 40 minutes later [about 1:10 a.m.] the suspect showed up again and ran straight for D.C.  The suspect began striking D.C.  L.B. did not see a weapon.  L.B. separated them.  He next saw that D.C. was bleeding so he helped him and never saw where the suspect went;

d.  L.B. described the stabber as 6 feet tall, 215 - 220 lbs, Caucasian and in his mid to late 20s.  His hair was dirty blond and very short.  He had tattoos on both arms - the tattoos were not shaded in.  The suspect wore a white t shirt that possibly had a pattern and dark grey sweat or track pants.

**STATEMENT OF A.U.**

41.  On June 26, 2016. at 2:23 a.m. Cpl. Brad ESSEX obtained an audio recorded statement from A.U., who stated the following:

a.  He was the head of security at the Tap House Bar;

b.  D.C. was working outside the front door;

c.   At 12:30 a.m., he was called by radio to attend to the front door as D.C. was having trouble with a Caucasian male [suspect];

d.   He described the suspect as Caucasian, approximately 5'10", short dark hair, wearing a white shirt and dark coloured sweatpants;

e.   D.C. advised that the suspect had been told he was not allowed to enter the bar, due to his behaviour and the dress code;

f.   The suspect was mad at D.C. and began to threaten him;

g.   The suspect told D.C. he was going to kill him;

h.   The suspect said to A.U. "I don't have a problem with you, it's him, your doorman [D.C], tell him he's dead, tell him Tony or Colby is going to get him";

i.   A.U. told D.C. to go back into the bar to help diffuse the situation;

j.   D.C. went inside and the suspect left the area. [This was approximately 12:45 a.m.];

k.   D.C. returned to work the front door at 1:00 a.m.;

l.   Moments later he saw that his other bouncers were attending to the front, so he came to assist from upstairs;

m.   Once he got to the front door, he saw that D.C. was laying on the ground and someone said he was stabbed.


**STATEMENT OF W.J.**

42.   On June 26, 2016 at 2:37 a.m., Cst. MUNTENER obtained a digitally recorded audio statement from one of the bouncers, W.J.  W.J. stated the following:

a.   He was working security at the Tap House;

b.   At approximately 12:30 a.m., he went outside because D.C. was involved with the suspect. He saw an altercation from a distance but then the suspect and his friends walked away;

c.   He then went back inside.  A while later, he saw the suspect struggling with D.C. at the main doors to the Tap House;

d.   The suspect backed away when he and L.B. approached him;

e.   The suspect had a knife in his right hand that was a folding pocket knife with a light coloured blade that was approximately 4" long;

f.    While the suspect was standing there, he threatened him and L.B. that he would hit them or kill them;

g.    A white or egg white Mercedes SUV slowly drove from south to north past the entrance to the Tap House with its front passenger door open;

h.    The suspect ran to the SUV and got in the front passenger seat;

i.    The suspect was a 20-25 years old male, and was Middle Eastern or a light skinned East Indian;

j.    He wore a short sleeved white shirt with dark blue jeans and all white possibly Nike shoes; and

k.    He wasn't sure but thought the suspect had tattoos on both arms.


## IDENTIFICATION OF TEIXEIRA


### TAPHOUSE CCTV FOOTAGE OBTAINED AND REVIEWED

43.   On June 26, 2016, at 3:51 p.m., Cst. MUNTENER met with the General Manager of the Tap House, R.S., who downloaded CCTV footage of the incident to a USB drive. Cst. MUNTENER noted that the video system time was accurate. Two cameras showed the door area where D.C. was stabbed.  The CCTV showed the altercation.  There were no cameras that showed the parking lot area.


### TEIXEIRA IDENTIFIED BY TAPHOUSE STAFF

44.   On June 27, 2016, at 10:59 a.m. Cst. Matthew WILLIAMS and Cst. Andrew MACMILLAN spoke with R.S. at the Tap House. R.S. showed the officers a screen shot sent to him from L.B.  The photograph was of a male with the name Brandon TEIXEIRA. R.S. stated that L.B. had looked through the Facebook friends of T█ Z██████ and located the photograph. The screen snapshot is a Facebook photograph and is attached as Exhibit "B".

**SECOND STATEMENT OF L.B.**

45. On June 27, 2016, at 7:48 p.m., Cst. Erica HANCOCK obtained a follow up statement from L.B. who said that he had reviewed T █ Z █ 's Facebook friends. L.B. was at the hospital with other Tap House staff waiting to see D.C. He looked through all of Z █ 's friends on Facebook and looked at their profile pictures. He came across the profile of TEIXEIRA and thought the picture looked similar to the male that stabbed D.C. He showed the picture to W.J. and A.U., who also thought it could be the suspect but weren't sure. L.B. was about 60% sure it was the same guy. He recognized the short hair and chubbier face; the face stood out to him. The picture of the Facebook photograph is attached as Exhibit "B".

**SECOND STATEMENT OF D.C.**

46. On June 28, 2016, Cst. WILLIAMS obtained a follow up statement from D.C. who confirmed that R.S. had showed him the Facebook photograph of TEIXEIRA [Exhibit "B"]. D.C. said that during the night's events he had dealt with the suspect for minutes, however, was aware of the suspect for upwards of 7 minutes as he was watching the suspect and his friends. D.C. was confident that the Facebook picture of TEIXIERA was the same person who stabbed him.

**PHOTOPACK PRESENTATIONS**

47. On August 28, 2016, Cst. MUNTENER arranged to have A.R., D.C., and W.J. attend the RCMP office to be presented photograph packs:

   a. A.R identified TEIXEIRA on the first viewing of the photograph pack. A.R. dealt with the suspect only during the first encounter with the bouncers, and not when he returned and stabbed D.C. The photopack photograph of TEIXEIRA that was included in the lineup and chosen by A.R. is attached as Exhibit "C";

   b. D.C. identified TEIXEIRA on the second viewing of the photograph pack. The photopack photograph of TEIXEIRA that was included in the lineup and chosen by D.C. is attached as Exhibit "D";

    c.    W.J. did not make an identification after viewing the photographs twice.

48.    On August 29, 2016, at 8:15 p.m., L.B. identified TEIXEIRA on the first viewing on the photograph pack. The photopack photograph of TEIXEIRA that was included in the lineup and chosen by L.B. is attached as Exhibit "E".

49.    On September 3, 2016, Cst. MUNTENER arranged the following:

    a.    At 10:05 a.m., a photo pack was presented to A.U and A.U. identified TEIXEIRA on the second viewing of the photo pack. The photopack photograph of TEIXEIRA that was included in the lineup and chosen by A.U. is attached as Exhibit "F";

    b.    At 3:00 p.m., J.B. viewed the photographs three times. He did not identify anyone, stating that there were two photographs he wasn't completely sure about so he couldn't make identification with certainty.

## STATEMENT FROM TEIXIERA

50.    On September 6, 2016, at 9:31 p.m., Cpl. Paula HARRIS obtained an audio and video recorded statement from TEIXEIRA, while TEIXEIRA was in police custody and after he had been read his *Charter of Rights*. TEIXEIRA discussed his life, including his addiction to cocaine and alcohol. TEIXEIRA stated that he broke a finger on his right hand playing volleyball on June 17 or 24, 2016. TEIXEIRA was shown the Facebook profile photograph of him that the Tap House staff had obtained [Exhibit "B"]. TEIXEIRA stated that it was his Facebook photograph. TEIXEIRA denied stabbing a bouncer at the Tap House. The statement was concluded at 11:34 p.m.

## ATTEMPTED MURDER OF P.D. AND C.W. – Maple Ridge Information 103266-1

### 911 CALLS AND INITIAL ATTENDANCE

51.    On August 23, 2015, at 2:30 a.m., J. F. called Ridge Meadows RCMP to report a stabbing and advised, in part, the following:

a.  J.F. was at the Haney Public House ("the Haney") at 22222 Lougheed Highway, Maple Ridge, and advised that there was a male "leaking badly" and that J.F. had seen him get stabbed;

b.  J.F. advised he did not see who stabbed the male and that an ambulance was required for the victim. J.F. saw a fight break out two minutes earlier and then the male had been stabbed.

52.  On August 23, 2015, Cst. Melissa ANDERSON responded to the report of the stabbing and learned of two stabbings:

a.  Cst. ANDERSON was the first police officer to arrive on scene and observed a large group of people standing around a male, later identified as P.D., laying on the sidewalk near the front entrance to the Haney parking lot;

b.  There was blood on the sidewalk, roadway, and blood all over P.D.  There were ten or more witnesses that were huddled around P.D.;

c.  Witnesses advised that a second person, C.W. was also stabbed by the same person who stabbed P.D.

d.  Cst. ANDERSON was advised by C.W. that the suspects fled northbound in a large black Ford F150 with dark tinted windows with a possible license plate of JG9011;

e.  C.W. also advised that the fight had been over a girl, S.H.;

f.  Cst. ANDERSON attended Ridge Meadows Hospital and spoke to C.W. and C.S. C.W. advised Cst. ANDERSON that he remembered the suspect truck attempted to run him over.  C.S said she remembered that people were calling the person who stabbed C.W. and P.D. "Colby" while inside the Haney.

## WITNESS STATEMENTS

### STATEMENTS OF C.W. (VICTIM #1)

53.  On August 23, 2015, C.W. provided a statement, stating in part the following:

a.   C.W. advised that earlier in the evening, he, P.D., and C.S. went to an establishment called the Caddy Shack and stayed there until closing time;

b.   Then, they all went over to the Haney and had more drinks. They met S.H. who was floating around the bar talking to people. S.H. was commenting about wanting to do blow [cocaine], and P.D. invited her over to their place to do some cocaine and go in the hot tub;

c.   S.H. told C.S. she knew where to get some cocaine. S.H. and C.S. went back into the bar, and went to a washroom with a male named "Colby", where he pulled out some cocaine [C.W. heard this from C.S., as he had remained outside];

d.   When S.H., C.S., and "Colby" returned outside, C.W. purchased a flap of cocaine from "Colby" for $80. He gave "Colby" $100 bill, and got a $20 bill in change;

e.   At bar closing, C.W., P.D., C.S, and S.H. were getting ready to leave in a taxi. "Colby" wanted S.H. to go home with him;

f.   S.H. declined "Colby's" request and indicated she was going to leave in the taxi with them, then "Colby" slammed the taxi door on P.D.;

g.   "Colby" threatened to follow the taxi back to their house;

h.   P.D. and C.W. got out of the taxi, anticipating a fight. C.W. went near the front of the taxi, and saw P.D. squared off to fight with "Colby";

i.   "Colby" was with 3-4 other guys;

j.   "Colby" punched C.W.'s neck. He did not see a knife in "Colby's" hands at the time;

k.   P.D. rushed at "Colby", who pulled out a four inch blade and stabbed P.D. in the neck;

l.   Blood was pumping out of P.D.' neck, 3 feet in the air;

m.   "Colby" ran northeast across a highway. Both P.D. and C.W. chased him;

n.   As P.D. was chasing "Colby", he realized he had been stabbed, and turned towards the Haney again, where he later collapsed close to the south sidewalk;

o.   Whilst they were chasing "Colby", a large black Ford F150 Raptor pickup truck came out of the parking lot and ran him over, accelerated straight at him. The truck clipped C.W. on its front passenger side/grill and C.W. hit his head on the hood, before bouncing off the side of the truck;

p.   C.W. captured the license plate as [BCL] "JG2011" and observed "Colby" get into the passenger side of the truck, possibly the rear, before it sped away;

q.   C.W. did not initially realize that he had been stabbed in the neck by "Colby";

r.   C.W. described "Colby" as being Caucasian, 5'7" tall, 160-170 pounds, 20-26 years old, having a heavy stubble, and wearing a white t-shirt with black on it, jeans and white shoes;

s.   The knife that "Colby" used was black, with a 3-4" blade, and was held in his right hand.

## STATEMENT OF P.D. (VICTIM #2)

54.   On February 18, 2016, Cpl. Ryan JOHNSTON obtained an audio recorded statement from P.D. who advised, in part, the following:

a.   On the night of the stabbing, he started drinking around 4:00 p.m. with C.W. [Victim #1], and C.S. They went to the strip club [Caddy Shack] at the Haney and stayed at the strip club until it closed;

b.   When the strip club closed, he did not go outside to go to the Haney. They walked through an internal door;

c.   He met a girl who was going to go home with him that night. There was another guy in the bar who wanted to take the same girl home with him. They called a taxi;

d.   C.W., C.S., the female who was going home with him [S.H.], and he got in the taxi. The suspect who also wanted to take S.H. home was saying to them that he was going to follow them to their house and that S.H. was coming with him. The male was very adamant that S.H. was going to go home with him;

e.   P.D. started to get out of the taxi when the suspect came up to him and slammed his foot in the door [It was later determined that P.D. had a broken ankle from this]. C.W. got out of the taxi to fight the belligerent suspect. P.D. saw C.W. get punched in the head by the suspect. He later realized that C.W. had been stabbed. P.D. remembers chasing after the suspect but does not remember getting stabbed;

f.   P.D. did not see the suspect holding any weapon and believes that he must have been concealing it.  The suspect who stabbed C.W. was the same male who wanted to take S.H. home with him;

g.   P.D. described the suspect who stabbed C.W. as being 5'10" tall, with a couple of day's facial hair growth, defined chin, and blue eyes. The suspect appeared to be "on drugs" from the way he was acting;

h.   He and C.W. had been looking for cocaine that night.  P.D. was not sure but they may have talked to the suspect who stabbed C.W. about buying cocaine;

i.   The injuries suffered by P.D. included the following:

    i.   He was stabbed in the jugular. He flat lined [no pulse] twice on the way to the hospital. He lost 80% of his blood and had to undergo multiple blood transfusions. He was on life support for more than two weeks and when they removed him from life support, he flat lined again;

    ii.   His kidneys and liver failed. A section of his intestines failed and had to be removed;

    iii.   He had a fractured ankle from the male slamming his foot in the door. He had to re-learn how to walk, which took him several weeks; and

    iv.   He cannot sleep at night and still requires two major surgeries because of the stabbing. He has been unable to work since the stabbing.


**STATEMENT OF C.S.**

55.   On August 23rd, 2015, Cst. Erich Schmidt obtained a recorded statement from C.S., who among other things advised that:

a.   She and S.H. were in the taxi with P.D. that night; and

b.   The suspect who wanted H.S. to come home with him, and confronted P.D. at the taxi, had earlier identified himself as "Colby" to her.


**STATEMENT OF WITNESS "B"**

56.   On October 29, 2018, at 10:52 a.m., Cpl. Tyler ENNIS obtained an audio/video recorded statement from Witness "B". During the statement, Cpl. ENNIS showed Witness "B" a video clip, titled "Video 1", which was a clip of the video with corrected

aspect ratio, from The Haney on August 23, 2015. The clip was 30 seconds in length, and showed the suspects arriving at the Haney. Witness "B" was asked if he recognized anyone in the video from the Haney to which Witness "B" said, in part, the following;

a.  Witness "B" informed that he had never seen the video before;

b.  Witness "B" knew people in the video. He recognized three of the people in the video as S███ C███████, R███ K████████, and Brandon TEIXEIRA., all of whom hung out together and were known to him. Witness "B" was "a million percent" sure that it was them;

c.  Witness "B" knew K████████ from picking up drugs off of him. K████████ had also contracted Witness "B" and TEIXEIRA to murder N██████ K████████

d.  Witness "B" knew C███████, as the two of them used to grow marihuana together;

e.  Witness "B" knew TEIXEIRA from committing crime(s) together;

f.  Witness "B" knew C███████ to have "████████████" as a nickname;

g.  Witness "B" knew K████████ to have "████████" as a nickname;

h.  Witness "B" knew TEIXEIRA to use "Colby" as a nickname.

## CCTV FOOTAGE FROM HANEY PUBLIC HOUSE

57.  On August 26, 2015, Cst. Chris FREAD of the Maple Ridge RCMP reviewed the CCTV footage from the Haney and learned, in part, the following:

a.  At 2:07 a.m., C.W. and P.D. walked up the stairs and spoke to S.H., C.S., and the suspect [TEIXEIRA];

b.  At 2:09 a.m., C.S., S.H., and the suspect entered the bar. [From C.S.'s statement I believe this is when C.S., S.H., and "Colby" went to the handicap stall in the bathroom and did cocaine. This is also when "Colby" told C.S. and S.H. that his name was "Colby"];

c.  At 2:24 a.m., S.H. and C.S. walked towards the rear of the taxi cab and out of view of the camera. The suspect followed S.H. and C.S. to the rear of the taxi. P.D. and C.W. walked toward the taxi;

d.  At 2:27 a.m. the suspect had an object in his right hand, [the knife]. The suspect appeared to strike C.W. on the left side of his neck/head with his right hand.

e.   P.D. went in between the suspect and C.W.;

f.   P.D. walked toward the suspect with his hands below his waist and the suspect
     lunged at P.D. with both hands toward P.D.'s neck and head;

g.   At 2:27 a.m. the suspect jumped back and appeared to be holding something in
     his right hand;

h.   P.D. walked toward the suspect and had his hands by his side. The suspect's
     arms were moving up and down towards P.D.;

i.   The suspect struck P.D. in the neck and head area with his right arm. The suspect
     backed up and P.D. moved towards him. The suspect made a motion with his right
     arm as if striking P.D., and backed up while P.D. pursued him. Blood began
     spurting on the ground from P.D.;

j.   P.D. and the suspect walked out of view to the South East, followed by C.W.;

k.   At 2:28 a.m., the suspect backed up westbound while being pursued by P.D. and
     C.W. until out of view.


## PHOTOPACK PRESENTATION TO C.S.

58.  On August 23, 2016, Cst. Shauna ENGLAND conducted a photograph lineup package
     with C.S.  C.S. viewed the photograph lineup twice.  C.S. identified one of the
     photographs as the male she knew as "Colby".  C.S. was only seventy-five percent sure
     this was the male.

59.  On August 23, 2016 at 1:45 p.m., Cpl. JOHNSTON viewed the photograph lineup
     package and observed that C.S. had identified TEIXEIRA as being the person who
     looked similar to the person who stabbed C.W. and P.D. The photopack photograph of
     TEIXEIRA that was included in the lineup and chosen by C.S. is attached as Exhibit "G".

60.   I swear this Affidavit in support of an application to have Brandon TEIXEIRA extradited from the United States of America and returned to Canada to answer to the charges set out in this Affidavit and to be dealt with according to law.

Affirmed before me at the City of Vancouver,  )
in the Province of British Columbia, Canada,  )
this 14th day of January, 2020  )
  )

Kris Mouland

_____
A Commissioner for taking affidavits in the
Province of British Columbia

**Cpl. Kris MOULAND**      Reg. 50864
Integrated Homicide Investigation Team

Sgt. Ed YOSHIYAMA      Reg 48908
Integrated Homicide Investigation Team

EXHIBIT "A"

This is exhibit _____ A

referred to in the Affidavit / ITO

of  Cpl  Kris  Mouland

sworn / affirmed before me this 14 day

of  January  2020

A COMMISSIONER FOR TAKING AFFIDAVITS
FOR BRITISH COLUMBIA



Re

Re — if he was skinnier he
kinda looke like the guy.

~~facial~~ ~~facial~~ ~~hair~~ ~~beard~~
Re
  - less facial hair.

  - same skin color

2048 hrs.
@ Nov. 2/17

EXHIBIT "B"



**Brandon Teixeira**

SEPTEMBER 23, 2015

EXHIBIT "C"

This is exhibit _____ C _____
referred to in the Affidavit / I+O
of _Cpl  Kris  Mouland_
sworn / affirmed before me this _14_ day
of _January_    _2020_

A COMMISSIONER FOR TAKING AFFIDAVITS
FOR BRITISH COLUMBIA



This is the man who attacked ▮ at Taphouse in June.

I spoke to him trying to get him to leave this first encounter We had with him.

2016 / 08 / 27

EXHIBIT "D"

This is exhibit _____
referred to in the Affidavit / ITO
of _Cpl Kris Mouland_

sworn / affirmed before me this _14_ day
of _January_ _2020_

_____
A COMMISSIONER FOR TAKING AFFIDAVITS
FOR BRITISH COLUMBIA



- eyes — darker underneath
- large/broad nose



2016 - 08 - 27

EXHIBIT "E"

This is exhibit _____ F _____
referred to in the Affidavit / ITO
of Cpl  Kris  Mouland
sworn / affirmed before me this 14 day
of  January    2020

A COMMISSIONER FOR TAKING AFFIDAVITS
FOR BRITISH COLUMBIA



-- his bushy eyebrows
- shape of his nose
- shape of his chin & jawline
- his short hair cut

These are all the same features of the man
I saw at the time of the crime

LB

EXHIBIT "F"

This is exhibit
referred to in the Affidavit / ITO
of _Cpl Kris Mouland_
sworn / affirmed before me this _14_ day
of _January_    _2020_

A COMMISSIONER FOR TAKING AFFIDAVITS
FOR BRITISH COLUMBIA





2016-09-03

EXHIBIT "G"

This is exhibit
referred to in the Affidavit / 〇
of Cpl Kris Mouland
sworn / affirmed before me this 14 day
of January 2020

A COMMISSIONER FOR TAKING AFFIDAVITS
FOR BRITISH COLUMBIA





Similarities:
 thick Eyebrows
 Facial Growth shade
 AGE RANGE
 LIPS feature